MARY ADAMS, Plaintiff-Appellee, v. ZAYRE CORPORATION, Defendant-Appellant.

Second District   No. 85—0576

Opinion filed October 20, 1986.

James S. Mills and Gates W. Clancy, both of Geneva, for appellant.

Jon Yambert, of Lindner, Speers & Reuland, P.C., of Aurora, for appellee.

JUSTICE STROUSE delivered the opinion of the court:
This suit was brought by a shopper for compensatory damages for false imprisonment. Defendant denied all material allegations and pleaded an affirmative defense of comparative negligence. The plaintiff, over defendant's objection, was permitted to amend her complaint four days before trial to pray for punitive damages. A judgment for $2,500 in general damages, plus $30,000 in punitive damages was en-

tered for plaintiff. A prompt post-trial motion was filed, argued and denied. This appeal timely followed.

On December 4, 1983, Mary Adams was detained by the security staff of the Zayre store in Aurora. On December 13, 1983, she filed suit against Zayre Corporation seeking damages in the amount of $15,000 for false imprisonment. She demanded a jury trial. On March 27, 1985, four days before trial, plaintiff moved, over defendant's objection, to file an amendment to the complaint realleging the essential elements of the first count and, in addition, the fact that plaintiff continued to be wrongfully detained after she had presented to the security staff her sales receipt for the items of merchandise in her possession. This count sought the sum of $15,000 in punitive damages. Defendant, four days thereafter, on the first day of trial, filed a second affirmative defense of lawful detention under the retail-theft statute (Ill. Rev. Stat. 1983, ch. 38, pars. 16A—5, 16A—6). The statute empowers a merchant who has reasonable grounds to believe that a person has committed retail theft to detain such person in a reasonable manner for a reasonable length of time.

Terry Jo Buckner, the security manager at the store, testified that Mary Adams entered the store with her daughter and son. They went straight to the domestics department, where they split up. Terry continually observed Mary as she picked up a pink radio, walked across two aisles and put it into her purse. Mary then walked to the front of the store. From there, Mary went to the boy's department where she was met by her son and daughter. Terry twice paged security while watching Mary in the boy's department.

Mary picked up some insulated underwear to buy and then went to the domestics department where she picked up two blankets. From domestics, Mary went with her daughter to the check-out lanes. Terry searched for the radio in the domestics department while still watching Mary.

Mary was in the store approximately one-half hour. She went through the check-out line and paid cash for her purchases. Terry and three security personnel confronted Mary after she exited the store. They testified they courteously asked her to return to the store. While Mary initially declined the request to return, she later did, in fact, walk back into the store on her own. Nobody from Zayre touched her. They escorted Mary and her daughter to a security room where, without being asked, Mary opened her blouse, pulled down her slacks and dumped her purse contents onto the floor. Her purchases were in her bag and she had a sales receipt in her hand. After nothing was found, apologies were made to Mary and she left.

When she left, she asked if she could use the side door. In her written report, Terry had recorded that Mary had asked if she could use the side door because she was too embarrassed to face the public. Mary was in the security room for not more than five minutes.

Terry testified that she watched Mary every time Mary came into the store because she caught her in 1981 trying to steal items in the health and beauty aids department. On that occasion, Mary had called her a "black bitch" and complained to the store manager. No reports were made of that incident. On a later occasion Terry caught Mary stealing toothbrushes and toothpaste. Again, Mary made reference to her as being a "black bitch." No report was made of that incident either. Terry wrote in her report of December 4, 1983, that the Aurora police department had told her that Mary was known to do things such as shoplifting and stealing.

Karen Lasocki, an employee of the store, testified on behalf of the defendant. She stated that she was working at Zayre on December 4, 1983, and was called from the cash room to the security room. She saw a lady standing outside the doorway with her shirt in the air and her pants down. The lady was asked to pull her pants up and pull her shirt down and was then taken to the security room where she again started to pull her shirt up. The lady was screaming that she didn't have any merchandise, and she turned her purse upside down. Karen was not a part of the security department, did not write a report of the incident and only remained in the security room for about two minutes. She had talked to defense counsel and Terry the day before her testimony and, other than that, has had no contact with the case since the occurrence.

Mary testified that she is 53 years old, has a 10th-grade education, has never tried to steal anything from Zayre, does not know any of the security people at the store, and has never called anyone there a "black bitch." She arrived at the store at 2:30 p.m. with her daughter, age 31, and son, age 22. Mary and her daughter went to the children's department. There she selected some insulated underwear for a grandchild and left the department after 15 minutes. She and her daughter went to the drapery department where they stayed 10 or 15 minutes. Her son, Larry, was at the pinball machines at this time. Mary and her daughter picked out two blankets and went to the check-out lanes with Lisa Dodge, a friend whom she had met in the children's department. Mary paid cash and received her receipt.

Her son walked out the doors about 10 feet in front of her. As she walked out of the door, two men, a black man and a white man, stopped her. The white man grabbed her daughter by the arm. The

black man grabbed Mary by the arm and told her that she had to come back to Zayre because she had something that belonged to Zayre that she did not pay for. She told him to leave her alone and pulled her arm away from him. He grabbed it again and said, "[C]ome on, you're going back with me in Zayre's [sic]." So she did, being held by the arm until she got through the entrance of the store, where she was released and escorted into the security room. No one had asked her for a receipt before she was taken inside. People outside the front doors had been looking and laughing.

In the security room there were two women from Zayre, one black and one white. They searched Mary's purse. After a short while Mary grabbed her purse and dumped the contents to show them that she did not have anything. Next, she unbuttoned her blouse and pulled down her pants to show them she did not have any unpaid-for merchandise. Zayre personnel were asking about a pink radio. They then searched her daughter's purse. Mary and her daughter had been in the room about 15 minutes when a black man came in with her blankets and receipt. He gave the receipt to Mary and stated that the pink radio was not in the blankets.

Mary asked to leave, but the store personnel ignored her request. They were writing their report. She felt nervous and sick and again asked if she could leave. They told her she would have to wait until they were done processing. They told her that somebody had told them she had stolen a pink radio. After another 15 minutes the black man came back in and told her she could leave. She asked if they had a back door because she did not want to leave in front of the public.

As she was leaving the store, she saw her ex-husband. He now lives in Rochelle. She does not speak to him. She came back to return the merchandise she had bought but kept the receipt. She felt hurt, embarrassed and sick for three days.

Plaintiff called Cecil Hart, a lieutenant and 20-year veteran with the Aurora police department. He is the keeper of the Aurora criminal records. He searched the records for arrests of Mary Adams and found nothing to suggest any thefts, theft-related activities or shoplifting.

Mary's son, Larry Potochney, also testified. His testimony was essentially cumulative to Mary's testimony. Outside the presence of the jury, defense counsel stated that he intended to impeach Larry with prior criminal convictions. Defense counsel produced various records, which he asserted were convictions. Plaintiff's counsel reviewed the records and pointed out to the trial judge that the documents contained only a complaint, not a conviction, of Larry. Other records produced by defense counsel were convictions of another person named

Thomas Lee Potochney.

The trial judge informed defense counsel that he was not to impeach the witness with those criminal records unless he was prepared to assure the court that he had evidence that the witness was the person convicted. Defense counsel was not able to give the court any such assurance. Without offering any certified court documents into evidence, defense counsel made a verbal offer of proof regarding the criminal convictions but did not offer proof that they involved the witness on the stand.

Lisa Dodge, a friend of the family, testified that she was shopping at the Zayre store on the relevant date and saw Mary and her daughter in the children's clothing department. She never saw Larry that day. She later saw Mary in the check-out lanes. A short while later she saw a black man holding Mary by the elbow, bringing her back into the store. Eight or ten people were crowded around and laughing.

Mary's daughter, Sophie Potochney, testified corroborating her mother's testimony.

On April 11, 1985, the jury found compensatory damages for the plaintiff in the sum of $2,500 and assessed punitive damages against defendant in the sum of $30,000. On May 8, 1985, in a 53-page post-trial motion alleging 235 errors, defendant moved the court to vacate the jury verdict, to enter a judgment notwithstanding the verdict, to request a remittitur, or, in the alternative, to order a new trial. The motion was denied, and this appeal was subsequently filed.

Defendant first contends that the trial judge abused his discretion by allowing plaintiff to amend her complaint to pray for punitive damages four days before trial when she did not allege any facts which were not known when she filed her original complaint. Defendant points to *Ennis v. Illinois State Bank* (1969), 111 Ill. App. 2d 71, 75, where the court stated that a party does not have an absolute right to amend its complaint. Defendant argues that the plaintiff had prior opportunities to assert her claim and should have been precluded from amending her complaint. See also *Blazina v. Blazina* (1976), 42 Ill. App. 3d 159 (trial court should prevent an order allowing amendment where the pleader had full knowledge at the time of his original pleading and presents no excuse for delay).

Granting or denying leave to amend is a matter within the sound discretion of the trial court and its decision will not be disturbed on appeal unless there is an abuse of discretion. (*Taylor v. City of Beardstown* (1986), 142 Ill. App. 3d 584, 591; *Cvengros v. Liquid Carbonic Corp.* (1981), 99 Ill. App. 3d 376, 379.) Section 2—616(a) of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—616(a)) specifi-

cally allows for amendments any time prior to final judgment. The greatest liberality should be applied in allowing amendments. (*Blazina v. Blazina* (1976), 42 Ill. App. 3d 159, 165.) Courts should readily permit pleadings to be amended unless the other party would be prejudiced thereby. (*Mentesana v. LaFranco* (1979), 73 Ill. App. 3d 204, 208.) In the instant case the defendant has never contended that he was prejudiced by plaintiff's amendment. In fact, the trial court allowed defendant to file a second affirmative defense on the day the trial started. We cannot say that the trial court abused its discretion.

■ Defendant next contends he was improperly barred from inquiring into a witness' prior criminal record. *People v. Montgomery* (1971), 47 Ill. 2d 510, holds that it is permissible to impeach a witness if his conviction meets certain standards. Robbery and theft are crimes which relate directly to credibility and conform to those standards. (*People v. Spates* (1979), 77 Ill. 2d 193, 202-03; *People v. Spurlark* (1979), 74 Ill. App. 3d 43, 53.) Defendant contends that no factor outweighed the use of the records in this case. In *People v. Birdette* (1961), 22 Ill. 2d 577, 581, it was held that, even in a criminal case, a witness other than a defendant may be examined as to his conviction and that it is not necessary to introduce the record of prior convictions independently. See also *People v. Kellas* (1979), 72 Ill. App. 3d 445.

In the instant case defense counsel stated, outside the presence of the jury, that he intended to impeach Larry Potochney with prior criminal convictions. He produced various records of another named individual who resided at Adams' address. In response to lengthy questioning by the trial judge, it became apparent that defense counsel had no evidence whatsoever that the two persons were the same but that he had intended to go on a fishing expedition hoping to make a connection.

The party introducing impeaching evidence must show that the convictions apply to the witness. (See *People v. Malone* (1979), 78 Ill. 2d 34.) It is improper to cross-examine as to prior conviction of a crime where the examiner is not prepared to follow up with proof of such conviction. (See *People v. Wallenberg* (1962), 24 Ill. 2d 350, 353; Hunter, Trial Handbook for Illinois Lawyers, sec. 72.6 (5th ed. 1983).) The use of unsupported insinuations in cross-examination is extremely prejudicial and is reversible error. (See *Bailey v. City of Chicago* (1983), 116 Ill. App. 3d 862, 864-67.) For these reasons the trial court's denial of defense counsel's attempt to impeach Larry was not in error.

■ Defendant next contends that since plaintiff rested without replying to the affirmative defenses authorized by sections 16A—5 and 16A—6 of the Criminal Code (Ill. Rev. Stat. 1983, ch. 38, pars. 16A—5,

16A—6) this court should enter a judgment notwithstanding the verdict for defendant. He points to *In re Marriage of Sreenan* (1980), 81 Ill. App. 3d 1025, and *Konczak v. Johnson Outboards* (1982), 108 Ill. App. 3d 513—cases which hold that a failure of a plaintiff to reply to new matter contained in an affirmative defense may constitute an admission to said matters where such pleadings are a valid affirmative defense. In *Lundberg v. Gage* (1961), 22 Ill. 2d 249, the court expressly held that allegations setting up affirmative defenses are, as a matter of law, admitted where no reply is made to them.

The record does not disclose that defendant raised this point of pleading now on appeal before the trial court. Defendant's amendment was offered and filed on the first day of trial, and the allegations of plaintiff's original complaint negate the affirmative defense filed. Where the complaint itself negates the affirmative defense, no reply is necessary. (*Warren Barr Supply Co. v. Haber Corp.* (1973), 12 Ill. App. 3d 147, 149; *Riddle v. La Salle National Bank* (1962), 34 Ill. App. 2d 116, 119.) A liberal construction should be afforded the rule that no reply is necessary if the complaint itself negates an affirmative defense (See *Nitrin, Inc. v. American Motorists Insurance Co.* (1968), 94 Ill. App. 2d 197, 206-07.) We hold that plaintiff was not required to reply further to defendant's affirmative defense filed on the first day of trial.

Defendant finally contends that the verdict, both as to general damages and as to the punitive award, was against the manifest weight of the evidence, and that even if it were not, the security guard's conduct cannot be imputed to Zayre. As to the general award, defendant argues that not all elements of the false imprisonment case were proved. Defendant claims that there was no testimony of any continued physical restraint of the plaintiff, apparently attempting to contrast the instant case with the facts in *Robinson v. Wieboldt Stores, Inc.* (1982), 104 Ill. App. 3d 1021, where the court noted that a guard was alleged to have held a 66-year-old unaccompanied female tightly by her arm during the entire confrontation.

As to the punitive award, defendant points to *Shelton v. Barry* (1946), 328 Ill. App. 497, 511, which holds that there must be reckless, oppressive, insulting, or wilful and malicious conduct to justify an award of punitive damages. Defendant relies on the retail-theft statutes (Ill. Rev. Stat. 1983, ch. 38, pars. 16A—5, 16A—6) which protect merchants in situations where reasonable grounds exist to believe that a person has committed retail theft. Defendant notes that in the instant case the security guard testified she saw the plaintiff place Zayre merchandise in her purse and that this would justify further reason-

able inquiry.

False imprisonment consists of the unlawful restraint, against a person's will, of that individual's personal liberty or freedom of locomotion. (*Karow v. Student Inns, Inc.* (1976), 43 Ill. App. 3d 878, 881.) Defendant is, however, afforded protection by sections 16A—5 and 16A—6 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, pars. 16A—5, 16A—6). A court of review will not set aside a jury verdict on the ground that it is contrary to the manifest weight of the evidence where there is sufficient credible evidence in the record to support the jury's verdict. See *Moehle v. Chrysler Motors Corp.* (1982), 93 Ill. 2d 299, 305.

██ A review of the record reveals that plaintiff's case in chief presents a case of false imprisonment. She testified that the security guard grabbed her by the arm after she exited the store. A minor struggle ensued, after which she was forcibly led back into the store and ushered to a security area. Four witnesses testified that she was under their forcible control.

Defendant had the burden of proving that it fell within the scope of sections 16A—5 and 16A—6, *i.e.*, that the actions of its security force were reasonable. This factual determination was for the jury. *Robinson v. Wieboldt Stores, Inc.* (1982), 104 Ill. App. 3d 1021, 1025.

██ The record reflects that the jury could have found defendant's actions to be unreasonable—both in manner of execution and time of detention. "The use of unnecessary force on suspected shoplifters by store personnel, as well as rudeness and harassment of the suspects, have been factors upon which the courts have determined either that the manner of detention was not reasonable as intended by the statute or that a finding to that effect was supportable." (Annot., 47 A.L.R.3d 998, 1020 (1973).) There was also corroborated testimony that defendant detained plaintiff for one-half hour—15 minutes of which was after they had concluded their search and investigation and determined that there were no grounds to continue holding the plaintiff. Further, based on the disputed testimony the jury could have found that no reasonable grounds existed for holding the plaintiff. We therefore cannot say that the jury's verdict as to general damages was against the manifest weight of the evidence.

██ We last address defendant's contention that punitive damages are inappropriate. Punitive damages are permitted where an arrest is effected recklessly, oppressively, insultingly or wilfully, with a design to oppress and injure. (*Robinson v. Wieboldt Stores, Inc.* (1982), 104 Ill. App. 3d 1021, 1025.) The manner of plaintiff's apprehension has already been described. This apprehension was conducted in violation of

the store's own guidelines as to the manner in which a suspect is observed and detained. These guidelines provide that a store security officer making an arrest must have continual and unbroken surveillance of a subject after the alleged taking, up to the actual apprehension of the subject. The officer must follow the suspect in such a manner as to have "both the subject and the merchandise under observation *at all times. If the subject gets out of sight even for a moment the apprehension cannot be made unless another theft act is witnessed.*" Since the security officers thoroughly searched the plaintiff and found no radio, it can only be concluded that, even if plaintiff had taken a radio, it was not in her possession at the time she left the store and she should not have been detained.

██ Also, the store guidelines for approaching suspected shoplifters were violated. The store policy as to approaching suspects is as follows:

> "Again, when the suspect reaches the sidewalk (outside the store) and the officer is sure of his case, this approach is suggested: 'Excuse me, my name is Sandy Smith, Store Security (showing I.D.). May I examine your cash register receipt for, (describe the article or articles concealed). When identification of the article has been established and examination of the receipt shows no ring-up, ask the suspect to return to the store to privately discuss the incident. If at all possible avoid touching the suspect. There are circumstances where this is necessary, sometimes the person needs to be coached along with the hand placed under an arm for direction and guidance through the store, BUT ROUGH TACTICS MUST BE AVOIDED."

The testimony of plaintiff and others was that this apprehension was conducted in a reckless, oppressive, insulting, and wilful manner. In *Robinson v. Wieboldt Stores, Inc.* (1982), 104 Ill. App. 3d 1021, a $10,000 punitive award was upheld where a security guard rudely and physically detained a shopper after she had worn a scarf which she had purchased that day in the store. The guard ushered her to the department where she had purchased the scarf, even after she showed him her receipt. The court stated that the guard's behavior of grabbing her tightly after he had been shown a sales receipt provided a sufficient basis for an instruction on punitive damages. Here, the jury found a factual basis for the punitive award, and we cannot say that the jury's award of punitive damages was against the manifest weight of the evidence.

██ Defendant's contention that the security officer's conduct cannot legally be imputed to the store is clearly incorrect. In *Robinson*

*v. Wieboldt Stores, Inc.* (1982), 104 Ill. App. 3d 1021, 1025, the court noted that punitive damages may be awarded against a master or other principal because of the acts of an agent under a limited set of circumstances.

In accordance with section 217C of the Restatement (Second) of Agency (1957), (cited with approval by our supreme court in *Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 36-37), punitive damages can be awarded against a master or other principal because of act of an agent only if: the principal authorized the doing and manner of the act; or the agent was unfit and the principal was reckless in employing him; or the agent was employed in a managerial capacity and was acting within the scope of his employment; or the principal or managerial agent of principal ratified or approved the act. (See *Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 36-37; *Robinson v. Wieboldt Stores, Inc.* (1982), 104 Ill. App. 3d 1021, 1025; *Holda v. Kane County* (1980), 88 Ill. App. 3d 522, 536.) Here, the entire observation, detention, and investigation was performed under the direction of Terry Buckner, the manager of the security division of the store. We find no error.

Finally, we note our displeasure with defendant's counsel's practice of improperly deluging the court with literally hundreds of unsupported alleged grounds for reversing the jury's verdict. Defendant's post-trial motion consists of 53 pages containing 235 points as grounds for his motion. A post-trial motion must contain succinct statements of the factual basis for the requested relief; general conclusions are unacceptable. (*Fedt v. Oak Lawn Lodge, Inc.* (1985), 132 Ill. App. 3d 1061, 1065.) The bulk of defendant's points are generalized legal conclusions; many are repetitious in nature and most have no factual allegations to support them. Incredibly, the first point of any substance to support one of defendant's briefed issues does not appear until page 36: error number 163! The point which supports the last of defendant's briefed issues does not appear until page 52: error number 233. This practice is unwarranted and wastes both the trial court's and this court's time and energy, not to mention counsel's client's funds.

Affirmed.

NASH, P.J., and WOODWARD, J., concur.