DAVID ABSHIRE, Plaintiff-Appellee, v. WILLIAM STOLLER, Defendant (Salk, Ward and Salk, Inc., Defendant-Appellant).

First District (6th Division)   No. 1—91—1978

Opinion filed September 25, 1992.

---

850

Henry F. Field, Ltd., of Chicago (Henry F. Field, of counsel), for appellant.

Joyce & Kubasiak, of Chicago (Arthur W. Aufmann, of counsel), for appellee.

JUSTICE RAKOWSKI delivered the opinion of the court:

This appeal arises from a fraud action filed by plaintiff, David Abshire, against defendants William Stoller and his employer, Salk, Ward & Salk, Inc. (Salk). The fraud action was based on plaintiff's claim that he was misled by Stoller's representation that a construction loan had been obtained by Stoller's employer, Salk, a mortgage banker in Chicago, Illinois. The jury returned a verdict in plaintiff's favor and awarded $9,481 in compensatory damages against both defendants as well as $45,000 in punitive damages against Stoller and

$350,000 in punitive damages against Salk. Salk then filed a post-trial motion for a judgment notwithstanding the verdict, a new trial or a remittitur of the $350,000 punitive damages award. The trial court denied Salk's motion and Salk brought this appeal. The issues on appeal are: (1) whether plaintiff could justifiably rely on the representations of Salk's agent regarding the loans plaintiff requested; and (2) whether it was proper to charge Salk with punitive damages based on the fraudulent conduct of its agent. We affirm in part and reverse in part.

Salk is a mortgage banking company which matches prospective borrowers with lending institutions and which then services the loans made. At the time of the transaction at issue, Salk had 20 to 25 employees on its payroll. Salk had arranged financing for many projects in the Chicago area but made no loans of its own funds.

According to the testimony of Salk's witnesses, Erwin Salk and Albert Berkson, the typical procedure for processing an application for a loan is to gather pertinent information from the appropriate sources. An analysis of the project is then performed to determine if it is a viable one and if there is an interested lender and under what terms. If the decision is made to proceed with the application, the potential borrower completes a written application and pays a good-faith deposit.

At this time, a mortgage submittal package is prepared and submitted to the potential lender for review. If approved by the lender, a written loan commitment is issued by that lender. The borrower would then sign the commitment and pay the standby fee. The conditions for disbursement as set forth in the commitment would be followed, and the lender would disburse the funds through an escrow with a title company. Construction loans are usually six months to two years and are followed by permanent loans which extend 5 to 30 years when the construction is completed.

In 1978, plaintiff began to inquire about opening a Goodyear tire dealership in South Holland, Illinois. Prior to this time, he had owned a body shop, and, although he had obtained loans on several occasions, he had no experience with the type of loan at issue here. Plaintiff initially sought funding for the construction of the dealership. One of the people he contacted was an acquaintance by the name of Rock Walker, who in turn contacted his friend William Stoller. Stoller had been hired by Salk that year as a "loan solicitor" and was given the title of vice-president. His job was to locate potential borrowers and draw up applications for others to review. According to the testimony of Salk's witnesses, Stoller was not authorized to approach potential

lenders, issue loan commitments, or communicate the results of applications, and he had no management responsibilities.

Stoller first contacted plaintiff in February 1979. According to plaintiff's testimony, Stoller reported hearing from Rock Walker that plaintiff was looking for money to fund a Goodyear project, and he invited plaintiff to his office to discuss it further. Before meeting with Stoller, plaintiff sought information regarding Salk and Stoller from an officer at Continental Bank. Plaintiff also checked the Illinois Services Directory, which listed Erwin Salk as the president, Albert Berkson as the senior vice-president, Mr. Zisook as the executive vice-president and William Stoller as the vice-president.

Plaintiff's meetings with Stoller took place in Stoller's office at Salk. Plaintiff testified that no one from Salk was ever present at the meetings nor did anyone other than Stoller communicate with plaintiff regarding the Salk loan. Plaintiff told Stoller that he was looking for both a construction and a permanent loan for the project, and he provided Stoller with information regarding projected costs, blueprints of the project and a letter from Goodyear indicating its interest. Stoller then told plaintiff that the way Salk worked was to try to match up information obtained from potential borrowers with potential lending sources and that the final paperwork would be completed after the project was approved. Stoller also told plaintiff that the construction loan would be paid off with the personal loan after the construction was completed. Plaintiff characterized this first meeting with Stoller as "applying for a loan" although no written application was prepared. Stoller informed plaintiff that he liked the project but would have to check with others.

According to Salk's witnesses, Stoller discussed plaintiff's interest in obtaining a loan with Berkson and Erwin Salk. Both recalled telling Stoller that the lenders would require Goodyear's guarantee or co-signature on the loan and that Stoller should obtain a copy of the dealership agreement. Both witnesses testified that they heard nothing further from Stoller regarding the transaction. Plaintiff stated that Stoller never informed him of these requirements.

Plaintiff testified that he was contacted by Stoller a month after their initial meeting. When he arrived at Stoller's office, Stoller informed him that Salk was ready to offer a $220,000 loan. Stoller also stated that Salk would require a 4% fee and a $1,500 good-faith deposit. Plaintiff stated that it was his understanding that Stoller had already secured the construction financing. Plaintiff asked when he could get the money, and Stoller replied that it would be several weeks to obtain the final paperwork and funding.

Plaintiff next met with Stoller in April of 1979. At this meeting, Stoller showed plaintiff a document identified as an "Application For Loan." Stoller said that he had sketched out the basic terms of their agreement for the file, and he gave plaintiff a copy. The document referred to a permanent loan for $220,000 as opposed to a construction loan for that amount or a permanent loan for $300,000 as plaintiff had apparently discussed. The document also stated that it was a loan application as opposed to loan commitment. Plaintiff stated that he did not read the document before signing it because he was told by Stoller that the document was just a sketch of the terms of their agreement and not the final paperwork.

Plaintiff testified that a few days after the April meeting, he received a call from Stoller requesting payment of the "good faith deposit," which was increased from $1,500 to $1,750. Plaintiff further testified that Stoller requested a $1,000 cash payment as soon as possible. Because plaintiff was leaving town, Stoller suggested delivering the money through Rock Walker. Plaintiff went to Walker's place of business and gave the money to Walker as he was leaving the building. Plaintiff also sent Stoller a check for $750 payable to Salk. Stoller subsequently acknowledged receipt of the $1,000 cash payment from Walker.

Around the same time that plaintiff was meeting with Stoller, plaintiff received a letter from Ford City Bank in Chicago dated May 11, 1979, which contained commitments for a construction loan for $230,000 and a permanent loan for $300,000. Plaintiff brought the letter to Stoller and questioned him regarding the fact that the Ford City commitment was for both loans while Stoller had only indicated that the construction loan was obtained. Stoller then replied that he was ready to "line up" the permanent loan. Stoller also informed plaintiff that the construction money would be available in 8 to 10 weeks and that there was no risk in letting the Ford City commitment expire.

Plaintiff did not receive any communication from Stoller for several months, and in July he renewed his application with Ford City Bank. By a letter dated July 26, 1979, plaintiff received a second commitment from the bank. Plaintiff confronted Stoller with the second commitment, and Stoller told plaintiff that $300,000 in permanent financing had been lined up with the Des Plaines bank through the president, Mr. Angelos. Stoller also promised that the construction funds would be available in time to begin construction before winter. Because of Stoller's promises, plaintiff let the second Ford City commitment expire.

In September 1979, Stoller contacted plaintiff and claimed that the construction funds were available but that plaintiff would have to agree to a higher interest rate. Plaintiff testified that when he came to Stoller's office, Stoller put a letter in front of him, but he does not remember whether he read it or signed it. In early October Stoller called plaintiff, said that the funding was "just about set" and that plaintiff should begin construction. When plaintiff asked about final paperwork Stoller replied that Salk routinely built projects even though the final documents were not completed so long as funding was in place. Although the plaintiff had no written documentation that any funding had been provided, plaintiff hired an excavator and concrete contractor and started the project.

James Lang, the concrete contractor on the project, began asking for partial payment. When he received no money from plaintiff, he contacted Stoller directly. Lang testified that he was told by Stoller that the money would be released in 7 to 10 days. According to plaintiff's testimony, Stoller reported that the other contractors had called Stoller and had been given the same information regarding the release of the funds.

In December of 1979, plaintiff again contacted Stoller to inquire about the funding. Stoller stated that he was embarrassed about the absence of funding and offered plaintiff his personal check for $5,000 as a loan until the funding was released. However, when plaintiff attempted to cash the check on two separate occasions, it was returned due to insufficient funds.

In February 1980, plaintiff tried to contact Stoller. When he was unable to reach him by telephone, plaintiff went to his office. When he eventually spoke to Stoller, he was told that there were no construction funds available. At that point, plaintiff stopped work on the project.

At the trial which commenced in April 1991, Stoller was not available to testify because he was in Federal custody regarding charges arising subsequent to Stoller's employment with Salk. His evidence deposition was also not obtained. Because of Stoller's absence, the testimony of Salk's witnesses that Stoller was acting without their knowledge or approval, and plaintiff's testimony regarding Stoller's promises that the loans were approved, was, therefore, unrebutted.

■ Salk raises several arguments in support of its contention that plaintiff's reliance on Stoller's representations was not justified. The elements of a cause of action for fraud are: (1) a false statement of material fact; (2) known or believed to be false by the party making the statement; (3) intent to induce the other party to act; (4) action by

the other party in reliance on the truth of the statement; and (5) damage resulting from such reliance. In addition, the reliance by the other party must be justified. (*Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286, 402 N.E.2d 599.) The proof of each element must be clear and convincing. *National Republic Bank v. National Homes Construction Corp.* (1978), 63 Ill. App. 3d 920, 924, 381 N.E.2d 15.

■ The first of Stoller's acts which allegedly gave plaintiff notice was the $1,000 cash payment requested by Stoller. Salk argues that because Stoller requested partial payment of the "good faith deposit" in cash, which was given to Rock Walker in a parking lot, plaintiff had notice of and participated in Stoller's fraudulent conduct against Salk. Salk also cites plaintiff's failure to request a receipt from Walker as further evidence that plaintiff was aware that Stoller was not acting on behalf of Salk.

Although Salk claims that the circumstances surrounding the $1,000 cash payment to Stoller should have given plaintiff notice, plaintiff testified that when Stoller requested the payment plaintiff was leaving the city. At this point, Stoller suggested that plaintiff deliver the money through Rock Walker, and it was plaintiff who chose to meet Walker at his place of business. According to plaintiff's testimony, the delivery of the money took place in the parking lot because plaintiff saw Walker leaving the building, and although he did not ask for a receipt at that time, Stoller verbally acknowledged receipt of the money when plaintiff returned from his trip. Plaintiff argues that he also had no reason to believe that the cash payment was other than what was represented because he was never notified by Salk that it had not received the good-faith deposit.

Salk also argues that the $5,000 personal check that Stoller gave to plaintiff as a loan was further notice that Stoller was defrauding Salk. However, plaintiff claims that he had no reason to question Stoller's conduct at the time because it occurred at Salk's offices. Plaintiff also states, contrary to Salk's allegation, that he did try repeatedly to contact Stoller at his office throughout the month of February 1980 but was unsuccessful.

Salk next argues that plaintiff could not justifiably rely on Stoller's representations because the alleged loan commitment lacked essential terms. (See *Delcon Group, Inc. v. Northern Trust Corp.* (1989), 187 Ill. App. 3d 635, 543 N.E.2d 595.) However, the plaintiff testified that, based on Stoller's representations in March 1979, the construction loan was for the amount of $220,000, at 10⅞% interest with a 4% fee and a $1,500 good-faith deposit. Stoller also told plaintiff at their first meeting that it was Salk's procedure to have the

construction loan paid off with the permanent loan when the construction was completed.

Relying on *Beaton & Associates, Ltd. v. Joslyn Manufacturing & Supply Co.* (1987), 159 Ill. App. 3d 834, 512 N.E.2d 1286, Salk contends that plaintiff is guilty of constructive fraud because he knew of and was willing to accept the fruits of Stoller's fraudulent acts. Thus, plaintiff had no right to rely on Stoller's representations, and he cannot maintain an action in fraud. Although Salk argues that *Beaton & Associates, Ltd. v. Joslyn Manufacturing & Supply Co.* is factually similar to this case, the trial court in that case found that the plaintiff did have knowledge of the agent's fraudulent conduct, and the appellate court held that there was evidence in the record to support the trial court's finding. In this case, the jury's verdict was that plaintiff did not have notice of Stoller's conduct and that his reliance on Stoller's representations was justified. For the reasons discussed above, we conclude that there was sufficient evidence to support the jury's verdict. We further conclude that the trial court's denial of Salk's motion for a new trial was not improper where there was no evidence of abuse of discretion. See *Cadral Corp. v. Solomon, Cordwell, Buenz & Associates, Inc.* (1986), 147 Ill. App. 3d 466, 483, 497 N.E.2d 1285.

■ Next, Salk contends that it cannot be charged with punitive damages for the fraudulent conduct of its agent where the agent was not acting in a managerial capacity. Generally, the purpose of awarding punitive damages is not compensatory but rather to punish the offender and to deter that party and others from committing similar acts of wrongdoing. (*Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 414, 563 N.E.2d 397; *Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 35, 330 N.E.2d 509.) Punitive damages may be awarded when acts of wrongdoing are committed with fraud, malice, violence or where the party acts willfully or wantonly. (*Loitz*, 138 Ill. 2d at 415, quoting *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 186, 384 N.E.2d 353.) However, "the punitive and admonitory justifications for the imposition of punitive damages are sharply diminished in those cases in which liability is imposed vicariously." (*Mattyasovszky*, 61 Ill. 2d at 36.) While the measurement of punitive damages is a jury question, the question of whether the facts of a particular case justify the imposition of punitive damages is one of law. *Kelsay*, 74 Ill. 2d at 187.

■ In this case, punitive damages were imposed on Salk vicariously for the fraudulent acts of its agent, Stoller. Since the Illinois Supreme Court's ruling in *Mattyasovszky* (61 Ill. 2d 31, 330 N.E.2d 509), Illinois courts have limited the imposition of punitive damages on a

corporation for the acts of its agents to the specific circumstances set forth in the Restatement (Second) of Agency §217C (1958) (hereafter section 217C). This section provides:

"Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if:

(a) the principal authorized the doing and the manner of the act, or

(b) the agent was unfit and the principal was reckless in employing him, or

(c) the agent was employed in a managerial capacity and was acting in the scope of his employment, or

(d) the principal or a managerial agent of the principal ratified or approved the act."

The parties in this case have stipulated that the issue of Salk's liability for punitive damages rests only on a determination of whether Stoller was acting in a managerial capacity when he committed the fraudulent acts. See Restatement (Second) of Agency §217C(c) (1958).

Salk argues that Stoller was not acting in a managerial capacity because his job was to solicit business, and he had no discretionary authority to establish company policy or make planning level decisions.

Relying on *Board of Education of Plainfield Community School District No. 202 v. Illinois Educational Labor Relations Board* (1986), 143 Ill. App. 3d 898, 493 N.E.2d 1130, *Illinois State Journal-Register, Inc. v. National Labor Relations Board* (7th Cir. 1969), 412 F.2d 37; *Loughry v. Lincoln First Bank* (1986), 502 N.Y.S. 2d 965, 494 N.E.2d 70, and the Restatement (Second) of Torts §909, Illustration 3, at 468-69 (1979), Salk defines a managerial employee as one who formulates, determines, and implements corporate policy and one who has discretionary authority to make final determinations independent of company consideration or approval. Salk also refers to Black's Law Dictionary 1112 (4th ed. 1968), which defines a manager as one who controls, directs or administers.

At the trial, the unrebutted testimony was that Stoller's authority was limited to calling potential customers, gathering preliminary information, and completing an application form to submit to others at Salk who would then decide on the appropriateness of a particular borrower or project for further consideration. Stoller did not have authority to communicate with potential lenders regarding loan applicants and did not have authority to issue or communicate loan commitments. Although Stoller had the title of vice-president, he had no executive role and was not a member of the board of directors. Fur-

thermore, there was no evidence that Stoller was responsible for directing the activity of any other employees.

Plaintiff argues that for the purpose of imposing punitive damages in the context of section 217C, Illinois courts also recognize as a manager one who is in a more limited position of control. In making this argument, plaintiff relies heavily upon *Deal v. Byford* (1989), 127 Ill. 2d 192, 537 N.E.2d 267, and *Adams v. Zayre Corp.* (1986), 148 Ill. App. 3d 704, 499 N.E.2d 678. In *Deal v. Byford,* the occurrence which precipitated the subsequent action was an altercation which erupted when Byford, an employee of an apartment complex, demanded that the plaintiff vacate her apartment. Plaintiff sustained injuries as a result of the incident and filed a claim against Byford and his employer, SRP Associates, the owner of the complex. In each count of her complaint, plaintiff alleged that Byford was the resident manager of the complex and was the agent for and employed by SRP Associates. Byford filed a verified answer to plaintiff's complaint admitting that he was an agent of SRP Associates and that he was acting within the scope of his employment on the day of the incident. *Deal,* 127 Ill. 2d at 196-97.

However, at the trial, Byford testified that he worked as a handyman for Masood Mahzar, the managing partner of SRP Associates, on a job-to-job basis and that he received an hourly wage in cash. He also stated that he never held himself out as an agent of SRP Associates and had not been aware of the significance of the document when he signed the verified answer to plaintiff's complaint. Byford acknowledged that his wife had signed his name as an agent of SRP Associates on the landlord's five-day notice but claimed that he had never received authorization from SRP Associates to act as its agent or manager. *Deal,* 127 Ill. App. 3d at 197-98.

Mahzar testified that during the time in question he had hired Byford to paint apartments and do other maintenance work in the complex but that he had not authorized Byford to sign any document as an agent or manager of SRP. *Deal,* 127 Ill. 2d at 198.

SRP Associates argued on appeal that the award of punitive damages against it was inappropriate because Byford was not acting in a managerial capacity at the time of the occurrence. (*Deal,* 127 Ill. 2d at 205.) In its rejection of SRP Associates' argument, the supreme court held that Byford was acting in a managerial capacity not because of the nature of his work but because SRP Associates and Byford admitted the truth of plaintiff's allegations in their answer to plaintiff's complaint. The court further concluded that SRP Associates' admissions were sufficient to satisfy the standard set forth in

*Mattyasovszky* (61 Ill. 2d at 35) and section 217C for the vicarious imposition of punitive damages. (*Deal,* 127 Ill. 2d at 206.) However, because the court never addressed the issue of Byford's role as a manager but held instead that it was judicially admitted, *Deal* contributes little support to plaintiff's argument.

In *Adams v. Zayre* a claim was brought against Zayre Corporation for false imprisonment when the security staff of one of the Zayre stores wrongfully detained the plaintiff to investigate an incident of retail theft. The appellate court upheld the imposition of punitive damages against Zayre Corporation based on its conclusion that the wrongful conduct had occurred under the direction of the manager of the security department. (*Adams,* 148 Ill. App. 3d at 714.) While the court in *Adams* did not elaborate on the security officer's role as a manager, it could be inferred that with respect to the security department at that particular store, he was in a position of authority and control.

As part of its discussion regarding the imposition of punitive damages pursuant to section 217C, the court in *Kemner v. Monsanto Co.* (1991), 217 Ill. App. 3d 188, 206, 576 N.E.2d 1146, addressed the meaning of managerial agent or employee. Relying on *Illinois State Journal-Register, Inc. v. National Labor Relations Board* (7th Cir. 1969), 412 F.2d 37, and *Board of Education of Plainfield Community Consolidated School District No. 202 v. Illinois Educational Labor Relations Board* (143 Ill. App. 3d 898, 493 N.E.2d 1130), the court in *Kemner* defined a managerial employee as one who "formulates, determines and effectuates his employer's policies, one with discretion or authority to make ultimate determinations independent of company consideration and approval of whether a policy should be adopted." (*Kemner,* 217 Ill. App. 3d at 206.) The court further described a "managing agent" as one "who acts with supervisory authority, being invested with general powers to exercise discretion and judgment in dealing with corporate matters; his interests are identified with those of the corporation." *Kemner,* 217 Ill. App. 3d at 206.

Whether we adopt the definition of a manager discussed in *Kemner* or the manager in *Adams* whose authority was limited to a specific department, we conclude that Stoller, the agent in this case, could not be considered a manager in either context where he had no authority or responsibility for any other employees or the operation of any department within the corporation.

Plaintiff claims that Stoller was a manager because he was the only one who had contact with the plaintiff regarding the loans at issue, and he was manager of that particular project. Plaintiff also ar-

gues that Stoller was hired by Salk to "put deals together" and was given the title of vice-president. Contrary to plaintiff's argument, the fact that Stoller was the only employee from Salk who had contact with plaintiff did not provide him with any managerial responsibilities, nor did he "manage" plaintiff's loan application. Based on the unrebutted testimony of Salk's witnesses, Stoller's sole function was to find potential applicants, assist in the application process and communicate information between Salk and the potential borrower.

Because we conclude that Stoller was not acting in a managerial capacity, Salk cannot be charged with punitive damages based on Stoller's fraudulent acts.

Accordingly, we reverse the order of the circuit court denying Salk's motion for a judgment notwithstanding the verdict as to the imposition of punitive damages against Salk, and we affirm the order as to the finding of fraud and the award of compensatory damages against Salk.

Reversed in part and affirmed in part.

EGAN, P.J., and McNAMARA, J., concur.