ROBOSERVE, INC., Plaintiff,

v.

KATO KAGAKU CO., LTD.,
et al., Defendant.

No. 92 C 5248.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 17, 1995.

Robert B. Breisblatt, Eric Charles Cohen, Avrum Sidney Katz, Jerold B. Schnayer, Suzanne Hines, Welsh & Katz, Ltd., Chicago, IL, for plaintiff.

Jerome H. Torshen, Abigail K. Spreyer, Torshen, Schoenfield & Spreyer, Ltd., Michael P. Connelly, Kathleen Anne Bridgman, Eugene Stuart Kraus, Charles Patrick Piacentini, Jr., Connelly & Schroeder, Chicago, IL, for Kato Kagaku Co., Ltd.

Jerome H. Torshen, Michael P. Connelly, Kathleen Anne Bridgman, Eugene Stuart Kraus, Chicago, IL, for Kato Real Estate Corp.

## *MEMORANDUM OPINION*

BRIAN BARNETT DUFF, District Judge.

On August 4, 1992, Plaintiff Roboserve, Inc. ("Roboserve"), sued Defendant Kato Kagaku Co., Ltd. ("Kato"), claiming breach of contract, wrongful termination, and fraud. The parties went to trial on October 18, 1993, and the jury returned a verdict in Roboserve's favor on all counts, awarding it compensatory and punitive damages totalling $9,950,000. Subsequently, Kato filed a motion for judgment as a matter of law, or, in the alternative, for a new trial or a remittitur. We grant in part the motions for judgment as a matter of law and remittitur, and we deny the motion for new trial.

### I. *Background*

Roboserve is a company that leases and services hotel minibars, and Kato owns the Hyatt Regency Chicago ("HRC"), a hotel in Chicago. On June 23, 1986, Roboserve and Hyatt Corporation ("Hyatt"), the HRC's manager, signed a Concession Agreement ("CA"). The CA provided, among other things, that Roboserve would install 1000 of its minibars, called RoboBars, in the HRC rooms and that the HRC would use reasonable endeavours to place guests who are the most likely to use minibars in the RoboBar rooms and, further, to encourage those guests to make purchases from the minibars.[1] On October 2, 1986, Roboserve and Hyatt negotiated an Amended CA. The amended version altered the CA's duration, making it last five years from "the date when

---

1. Section 8(1)(n) of the CA provides: "[U]se reasonable endeavours to procure that rooms in which RoboBar Units are operating are first let to guests who are best able to use the facilities thereby offered and in priority to any rooms at the Location in which no such unit is operating."

Section 9(3) provides: "[U]se ... reasonable endeavours to encourage the purchase of merchandise from the RoboBar Units at the Location ..."

all the RoboBar units have been commissioned," meaning installed. A Roboserve representative signed the amended CA, but a Hyatt representative did not.

Four issues arose during the implementation phase of the CA. First, between February and April 1987, Roboserve installed in the HRC's west tower only 900 of the called-for 1000 units. Second, Hyatt contracted with ServiSystems, a Roboserve competitor, to install in the east tower a number of ServiBars, the ServiSystems minibars. Third, as a result of having the second minibar system in the hotel, the HRC may not have used reasonable endeavors to ensure that it placed the "correct" people in the RoboBar rooms. Fourth, the HRC also may not have used reasonable endeavors to encourage guests to make purchases from the RoboBars.

Of the four issues, the one surrounding Hyatt's relationship with ServiSystems was the most complex. In late 1987, Roboserve learned of Hyatt's intention to contract with ServiSystems, and on April 22, 1988, Roboserve received a letter from Hyatt confirming its intention to "proceed with the ServiBar installation into the west tower."[2] Pl. Ex. 2. Unbeknownst to Roboserve, on May 1, 1988, Hyatt signed a contract with Servisystems to provide ServiBars for the HRC "for a term commencing on May 15, 1988 and expiring on May 14, 1995." Pl.Ex. 12. On November 11, 1988, however, after Kato acquired the HRC and confirmed Hyatt as the hotel's manager,[3] Mr. Zadikoff, one of Hyatt's vice presidents, wrote to Roboserve the following:

> As we discussed, our objective at the Hyatt Regency Chicago was to evaluate the two Honor Bar systems that are presently being utilized in our hotels—RoboBar and ServiBar. The agreement was that ServiBar would be installed in one tower of the Hyatt Regency Chicago for a one-year test

period only, so that we could evaluate both sales potential and operational costs. Pl.Ex. 3. According to Roboserve, Hyatt also communicated to it orally that the winner of the test would become the preferred minibar provider for Hyatt hotels and would "get the Hyatt business."

After Roboserve won the one-year test, Hyatt negotiated with Roboserve about replacing the ServiBars with RoboBars, despite Hyatt's contract to maintain the ServiBars at the hotel through 1995. Much later, on February 26, 1992, Hyatt announced that it had "complications of another contractual arrangement" and would be unable to replace the ServiBars with RoboBars. Pl.Ex. 32. On December 14, 1992, Mr. Keeshin, Hyatt's Associate General Counsel, informed Roboserve that, as of March 1, 1993, Hyatt would terminate the amended CA. Pl.Ex. 196.

## II. Discussion

### A. Standard of Review

Kato moves for a judgment as a matter of law, or, in the alternative, for a new trial.[4] Kato's motion "is a remedy for a party who lost the verdict. He ... contends that he is entitled to judgment as a matter of law. By the alternative motion, he asks the court to grant him a new trial if he is wrong in his contention that he is entitled to judgment." 9 Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure,* § 2539 (1971).

"As to the motion for [judgment as a matter of law], ... we apply the Illinois rule that such a motion should be granted only if 'all of the evidence, when viewed in its aspect most favorable to the opponent [of the motion] so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand.'" *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.,* 962 F.2d 628, 640 (7th Cir.1992) (quoting *Schultz v. Amer. Airlines, Inc.,* 901 F.2d 621,

---

**2.** As the parties made clear at trial, the ServiBars went into the east tower, not the west. Def.'s Br. at 15.

**3.** On August 12, 1988, Kato acquired the HRC, and on October 18, 1988, Kato assumed the prior

owner's management agreement, which provided that Hyatt would manage the hotel.

**4.** Below, in the damages section, we will discuss Kato's motion for remittitur and present the applicable standard of review.

623 (7th Cir.1990) (quoting an Illinois Supreme Court case)).

"On motions for a new trial the federal standard applies, even in diversity cases. [citation omitted]. Under the standard, 'a new trial can be granted only when the jury's verdict is against the clear weight of the evidence.'" *Id.* (quoting *Davlan v. Otis Elevator Co.,* 816 F.2d 287, 289 (7th Cir.1987)).

## B. Breach of Contract Claim

### 1. Kato's Denial of Breach

■ First, Kato denies that it breached the CA by allowing the installation of only 900 of the called-for 1000 RoboBars. It claims that Roboserve installed only 900 units because Roboserve never asserted its right to install the additional 100. Kato argues that it should not now be forced to pay damages for Roboserve's failure to maximize the CA.

Roboserve maintains that Kato breached the CA. For support, it points to the testimony of Mr. Fattal, a Roboserve executive. At trial, Mr. Fattal referred to his February 20, 1987, letter to Mr. Connolly, Hyatt's Senior Vice President and General Counsel, in which he wrote: "As regards installations, the position is as follows:— ... (iv) [the HRC]: Being installed starting 9 February, with approximately 900 bars. Should be completed during March." Pl.Ex. 41; Tr. at 93. Mr. Fattal testified that, through this letter, he informed Hyatt of the intentions of Roboserve to install the additional 100 units. Tr. at 93. Mr. Fattal claimed that Hyatt understood Roboserve's intentions and wanted to frustrate them. As evidence, he pointed to an internal memo that Mr. Connolly wrote and attached to the February 20 letter. The memo states: "Before proceeding with any further installations, I believe we should review the success (or lack thereof) of the Robobar program to date." Pl Ex. 41.

Mr. Fattal also testified that Mr. Wood, another Roboserve employee, informed Hyatt of the intentions of Roboserve with regard to the 100 units. When Roboserve's counsel asked Mr. Fattal if he "kn[e]w if [Mr. Wood] ever discussed the hundred bars [with Mr. Connolly]", Mr. Fattal responded: "I believe so, yes, sir." Tr. at 97.

Roboserve's evidence of its intentions about the 100 minibars is unclear. Does Mr. Fattal's February 20 letter imply that Roboserve would "start[ ]" the installation process with the 900 units and "complete[ ]" it with the remaining 100? Does the letter imply that Roboserve would start the installation process with the 900 units in "February" and complete it with the remaining 100 in "March"? Does Mr. Fattal's testimony about Mr. Wood imply that Mr. Wood told Mr. Connolly about Roboserve's intention to install the additional minibars?

Although Roboserve's evidence is unclear, for the purposes of Kato's motion we view the evidence "in its aspect most favorable to the opponent." *Hardin,* 962 F.2d at 640. Viewed in that aspect, we cannot say that the evidence "so overwhelmingly favors the movant that no contrary verdict based on [it] could ever stand." *Id.* Therefore, on this point, Kato is entitled to neither a judgment as a matter of law nor a new trial.

Second, Kato denies that it breached the CA by failing to use reasonable endeavors to place the "correct" people in the RoboBar rooms or to encourage those people to make purchases from the minibars. It claims that Roboserve produced insufficient evidence to prove that Kato breached and that, in any event, such evidence would be difficult to produce given that Hyatt could not know which hotel guest would want to use a minibar on any given night.

Roboserve maintains that it produced sufficient evidence. For example, it points to the evidence that, although Hyatt knew guests who stayed in its Gold Passport rooms would, on average, purchase more items from minibars, it allowed only ServiBars in those rooms. Tr. at 125, 569. Also, Roboserve points to the evidence that Hyatt's standard procedure for welcoming guests excluded informing them that their room contained a RoboBar. Tr. at 603–4.

Here, Roboserve's evidence is unambiguous. Kato could have allowed RoboBars in the Gold Passport rooms, but it did not. *Cf.* CA § 8(1)(n). It could have informed guests

of their RoboBars, but it did not. *Cf.* CA § 9(3). In other words, Kato knew of concrete, objective ways to promote RoboBars, but it opted against promoting them. From the evidence, it is possible to conclude that Kato did not use reasonable endeavors and that, consequently, it breached the CA. Therefore, on this point, Kato is entitled to neither a judgment as a matter of law nor a new trial.

### 2. Kato's Affirmative Defenses

Kato argues that we erred when we disallowed its affirmative defenses of waiver, estoppel and mitigation. Specifically, it argues that the CA's non-waiver clause should not have precluded its raising the issue of waiver at trial. The non-waiver clause provides: "The rights and remedies of the parties shall not be diminished waived or extinguished by the granting by one party of any indulgence forbearance or extension of time to the other party nor by any failure or delay by a party in asserting or exercising such rights or remedies." CA § 19. Kato asserts that Roboserve's continuing failure to complain about the additional 100 minibars and the lack of reasonable endeavors should estop it from taking refuge behind the clause.

Roboserve argues that we correctly upheld the integrity of the non-waiver clause. Roboserve made complaints about the 100 minibars and the lack of reasonable endeavors, but it was reluctant to pursue them. Kato "bullied" it into accepting the one-year test, making Roboserve fear that, if it pursued the complaints, it "would forever 'lose the Hyatt business.'" Pl.Br. at 14. Further, the point of the non-waiver clause was to avoid estoppel arguments such as that of Kato.

Non-waiver "clauses are enforceable [in] Illinois," *Monarch Coaches, Inc. v. ITT Industrial Credit,* 818 F.2d 11, 13 (7th Cir. 1987), and operate as a matter of law. *Transcraft Corp. v. Anna Indus. Dev. Corp.,* 223 Ill.App.3d 100, 103, 165 Ill.Dec. 599, 584 N.E.2d 1033 (5th Dist.1991).

In *Transcraft,* the court gave "full force and effect" to a non-waiver clause when the plaintiff brought suit against a defendant who, for over twenty years, regularly and continuously breached the contract by failing

to pay its portion of the local property taxes. *Id.* at 103, 165 Ill.Dec. 599, 584 N.E.2d 1033. The court stated:

> The NO WAIVER clause makes clear that any failure to demand strict performance or to take advantage of any terms, conditions, or rights was neither a waiver nor the relinquishment of the terms, conditions, or rights within the contract. Therefore, under the NO WAIVER clause, of the contract, [the defendant's] obligation to pay the excess taxes remains in full force and effect despite [the plaintiff's] failure to deduct the taxes it paid from rent.

*Id.* at 103, 165 Ill.Dec. 599, 584 N.E.2d 1033 (quotations removed). In fact, the appellate court believed that the clause remained in such "effect" that it reversed the lower court and remanded with directions to grant summary judgment on this issue in favor of the plaintiff. *Id.*

In *Gen. Grocer Co. v. Bachar,* the court gave similar weight to a non-waiver clause when the plaintiff brought suit against the defendant who, on various occasions, breached the security agreement by failing to pay on a date certain. 51 Ill.App.3d 907, 911–2, 8 Ill.Dec. 720, 365 N.E.2d 1106 (3rd Dist.1977). The court reasoned that, "[i]n the light of such 'non waiver' clause, which was agreed to by the defendants, we cannot interpret the plaintiff's conduct in accepting tardy payments (whether such instances be few or many) to constitute a suspension of the terms of an agreement to make payments on a date certain." *Id.* at 912, 8 Ill.Dec. 720, 365 N.E.2d 1106; *see Zinser v. Uptown Fed. Sav. and Loan,* 185 Ill.App.3d 979, 982–3, 134 Ill.Dec. 87, 542 N.E.2d 87 (1st Dist.1989), *appeal denied,* 128 Ill.2d 673, 139 Ill.Dec. 524, 548 N.E.2d 1080 (1990) (following *Gen. Grocer*).

On the other hand, in *Whalen v. K–Mart Corp.,* 166 Ill.App.3d 339, 345–6, 116 Ill.Dec. 776, 519 N.E.2d 991 (1st Dist.), *appeal denied,* 121 Ill.2d 587, 122 Ill.Dec. 448, 526 N.E.2d 841 (1988), the court ruled that a "broad, general boilerplate [non-waiver clause] do[es] not negate [the plaintiff's] waiver" by conduct. *Id.* at 346, 116 Ill.Dec. 776, 519 N.E.2d 991. In *Whalen,* the plaintiff sued a contractor, who, in turn, sued his

subcontractors for contribution and indemnity based on their contractual responsibility to name him in their insurance policy, which they did not do. Despite the subcontractors' failure to properly insure, the contractor allowed them to work. By doing so, he waived the responsibility to insure requirement. The court considered whether the contractor could then deny the waiver based on the contract's non-waiver clause. The court ruled that the contractor could not.

*Whalen* is distinguishable on three grounds from the other Illinois precedent and from our case. In *Whalen*, the contractor waived a condition precedent. The terms of the contract made clear that the subcontractors could not begin work until they had "obtained all insurances." *Id.* at 341, 116 Ill.Dec. 776, 519 N.E.2d 991. Further, the contractor reached back into a closed relationship. The suit arose after the subcontractors completed their work and received payment in full. Further still, the contractor included the non-waiver clause solely for his own benefit. *Id.* at 345, 116 Ill.Dec. 776, 519 N.E.2d 991. Reading *Whalen*, it appears that the court believed the contractor should not prevail, and, because it needed somehow to sidestep the non-waiver clause, it simply dismissed it as boilerplate and trotted out the "specific versus general" contract provision case law.

■ *Transcraft* sits atop a unified group of cases, except for *Whalen*, each of them upholding the integrity of the non-waiver clause. On the basis of *Whalen*, Kato wants us read a split into Illinois law, but we decline to do so. We correctly ruled that the non-waiver clause precluded Kato's defense of waiver, particularly since "[t]here [was] no possible injustice in enforcing [it]." *Monarch Coaches*, 818 F.2d at 13. Moreover, we correctly did not allow Kato to enter through the back door with its defenses of estoppel and mitigation.

Therefore, once again, Kato is entitled to neither a judgment as a matter of law nor a new trial.

## C. Wrongful Termination Claim
### 1. Background

Kato argues that the parties never completed the amended CA. Because the CA, not the amended CA, was operative and because the CA ran its course before Kato terminated the agreement on March 1, 1993, the termination was not wrongful, meaning it was not premature.

Roboserve argues that the parties did complete the amended CA and that the amended version was operative. Under the amended CA, the contract was not supposed to run its course until five years after Roboserve installed all 1000 minibars. The calendar, however, never began to run because Kato disallowed Roboserve's installation of all 1000. Consequently, when Kato terminated the contract it did so prematurely.[5]

### 2. Kato's Denial of Wrongful Termination

■ First, Kato argues that the amended agreement failed under § 26 of the CA, the contract's "waiver only in writing clause," which provides:

> This Agreement and any other matters agreed in writing between the parties hereto in relation to the subject matter of this Agreement shall constitute the entire agreement between the Company and the Hotel in relation to such subject matter and no variation to the same shall be binding on the Company unless in writing and signed by both parties.

Because neither Kato nor one of its representatives signed the amended CA, the parties did not satisfy § 26, and, consequently, the amendment should not have bound Kato.

Roboserve responds that Kato satisfied § 26, and, if it did not, it waived the section. Kato satisfied § 26 with its signed December 14 letter in which it referenced the amendment and implied its binding authority. The letter states: "Pursuant to Section 4 of the June 23, 1986 Agreement between Roboserve, Inc. and Hyatt Corporation and the modification thereto dated October 2, 1986, be advised that Hyatt Corporation as agent for Kato Kagaku Company, Ltd., ... hereby serves notice of termination of the Agree-

---

5. In the jury instructions, we approved a special interrogatory on this issue, and the jury found that the parties agreed to the amended CA and that the five year calendar never began to run.

ment on March 1, 1993." Alternatively, Kato waived § 26 through its words and deeds. The words included the December 14 letter and several letters from Kato's trial counsel, all of which indicated Kato's acceptance of the amended CA. Pl.Exs. 212–5. The deeds included terminating the agreement only after Kato believed the amended CA would soon run its course.

Clearly, if the parties satisfied § 26, that would be sufficient, and the amended agreement would control. Otherwise, "the weight of authority in Illinois holds that Waiver Only in Writing provisions can be waived by words and deeds of the parties so long as the waiver is proved by clear and convincing evidence." *Chicago College of Osteopathic Medicine v. Fuller Co.*, 776 F.2d 198, 202 (7th Cir.1985).

Based on our Statute of Frauds discussion, below, the parties satisfied § 26. In any event, given the December 14 letter, the several letters from Kato's trial counsel, and the timing of Kato's termination of the agreement, there is sufficient evidence to support jury's finding that Kato waived § 26. *See Id.* Therefore, on this point, Kato is entitled to neither a judgment as a matter of law nor a new trial.

▪ Second, Kato argues that, without its signature, the amended CA failed under the Statute of Frauds.

Roboserve responds that Kato waived the Statute because it admitted being bound by the amended CA and, moreover, acted as if it were bound. Again, Roboserve points to the December 14 letter and the various letters from Kato's trial counsel.

The Illinois Statute of Frauds provides, in relevant part:

No action shall be brought ... to charge any person ... upon any agreement that is not to be performed with the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged

therewith, or some other person thereunto by him lawfully authorized.

740 ILCS 80/1.

Illinois common law establishes the technical requirements for satisfying Statute of Frauds. "No particular form of memorandum is required to satisfy the statute (citation omitted), and it is not necessary that a ... memorandum be in one writing, but may consist of several writings taken together." *Poulos v. Reda*, 165 Ill.App.3d 793, 800, 117 Ill.Dec. 465, 520 N.E.2d 816 (1st Dist.1987); *see Cafcas v. DeHaan & Richter, P.C.*, 699 F.Supp. 679 (N.D.Ill.1988). To satisfy the Statute "from more than one writing, only one of which has been signed, the signed writings must refer specifically to the other writings and must be so connected, either physically or otherwise, as to show by internal evidence that they relate to the same contract." *Id.; see Bower v. Jones*, 978 F.2d 1004, 1008 (7th Cir.1992).

Moreover, Illinois case law establishes the theoretical requirements for satisfying the Statute. "The purpose of the Statute is to prevent the fraudulent enforcement of contracts that were not made, not to enable contractors to repudiate contracts that have in fact been made." *Poulos v. Reda*, 165 Ill.App.3d at 801, 117 Ill.Dec. 465, 520 N.E.2d 816. "State statutes of frauds serve a purely evidentiary function—to prevent enforcement through fraud or perjury of fictitious agreements." *Konigsberg Int'l., Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir.1994). " 'To the extent that the statute's function is viewed as evidentiary, it is difficult to see why the statute should not be satisfied by a written admission in a pleading, stipulation, or deposition.' " *Bower*, 978 F.2d at 1009 (quoting II *Farnsworth on Contracts*, § 6.7, at 134 (1990)).

Kato's letters satisfied the technical and theoretical requirements of the Statute. As to the technical requirements, the December 14 letter referred specifically and internally to the amended CA. As to the theoretical requirements, the trial counsel's letters amounted to admissions that the parties completed the amended CA. *Paist v. Town and Country Corp.*, 772 F.Supp. 412, 416 (N.D.Ill. 1991). Therefore, on this point, Kato is enti-

tled to neither a judgment as a matter of law nor a new trial.

■ Third, Kato argues that if its letters satisfied the Statute of Frauds, the satisfaction came too late. For support, Kato relies on *Culbertson v. Carruthers,* which stated that if "an offer prescribes no time for acceptance, a reasonable time is implied." 66 Ill. App.3d 47, 54, 22 Ill.Dec. 810, 383 N.E.2d 618 (5th Dist.1978). Kato contends that its letters did not arrive within a reasonable time.

Roboserve maintains that the letters arrived within a reasonable time and, if they did not, their late arrival merely evidenced an intended earlier, seasonable acceptance of the amended CA.

Whether Kato accepted or intended to accept Roboserve's offer within a reasonable time is a factual matter for the jury. Judgement as a matter of law is "inappropriate[ ] if the parties disagree on the inferences which may reasonably be drawn from those undisputed facts." *Cent. Nat'l Life Ins. Co. v. Fidelity and Deposit Co.,* 626 F.2d 537, 539–40 (7th Cir.1980); *see Paist,* 772 F.Supp. at 414–5. We determine, then, only whether the jury's finding was unreasonable. By referencing the amended CA in its December 14 letter, Kato revealed that it believed itself bound. Moreover, by maintaining its negotiations with Roboserve until it believed the amended CA would soon run its course, Kato acted as if it were bound. In light of these facts, the jury's finding was not unreasonable. Therefore, on this point, Kato is entitled to neither a judgment as a matter of law nor a new trial.

■ Fourth, Kato argues that Roboserve should not be able to treat the December 14 letter as an anticipatory breach because it was not a positive and unequivocal repudiation. For support, Kato states that Roboserve maintained its units in the HRC after the supposed March 1, 1993, termination date. Maintaining them there would not

have been an option if Kato truly repudiated the contract.

Roboserve argues that it should be able to treat the December 14 letter as an anticipatory breach because the letter's language is positive and unequivocal and, after Kato breached, Roboserve promptly filed suit.

The case law on anticipatory repudiation is well settled. " 'Because the doctrine of anticipatory repudiation represents a harsh remedy, the requirement that a repudiating statement be clear and absolute is a strict one.' " *LAK, Inc. v. Deer Creek Enter.,* 976 F.2d 328, 331 (7th Cir.1992) (quoting *Commonwealth Edison Co. v. Decker Coal Co.,* 612 F.Supp. 978, 981 (N.D.Ill.1985)). " 'To constitute an "anticipatory breach," . . . it must appear that the party bound under a contract has unequivocally refused to perform', or as the Supreme Court put it in *Dingley v. Oler* (citation omitted), there must be 'a positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time.' " *City of Fairfax v. Washington Metro. Area Transit Auth.,* 582 F.2d 1321, 1326 (7th Cir. 1978), *cert. denied,* 440 U.S. 914, 99 S.Ct. 1229, 59 L.Ed.2d 463 (1979) (quoting *Suburban Improvement Co. v. Scott Lumber Co.,* 67 F.2d 335, 337 (4th Cir.1933)).

Once a party anticipatorily repudiates a contract, the non-breaching party may respond in a number of ways. "The promisee may, among others,[6] elect to treat the repudiation as a breach putting an end to the contract for all purposes of performance." *Wilmette Partners v. Hamel,* 230 Ill.App.3d 248, 260, 171 Ill.Dec. 657, 594 N.E.2d 1177 (1st Dist.), *appeal denied,* 146 Ill.2d 654, 176 Ill.Dec. 824, 602 N.E.2d 478 (1992) (citing *Builders Concrete Co. v. Faubel & Sons, Inc.,* 58 Ill.App.3d 100, 104, 15 Ill.Dec. 517, 373 N.E.2d 863 (3rd Dist.1978)). "A promisee may pursue such an election by either promptly filing suit or by detrimentally changing his position in reliance on the repudiation." *Id.* (citing *Builder's Concrete,* 58

---

**6.** "Upon receiving an anticipatory repudiation by the promisor, the promisee has a choice of pursuing three alternative remedies. The promisee may (1) rescind the contract and seek quasi-contractual relief; (2) attempt to keep the contract in force by awaiting time for the promisor's performance and then bringing suit; or (3) elect to treat the repudiation as a breach putting an end to the contract for all purposes of performance." *Builder's Concrete Co. v. Faubel & Sons,* 58 Ill.App.3d 100, 104, 15 Ill.Dec. 517, 373 N.E.2d 863 (3rd Dist.1978).

Ill.App.3d at 104, 15 Ill.Dec. 517, 373 N.E.2d 863). However, "'[a] continued willingness upon the part of the injured party to receive performance is an indication that, if the repudiator will withdraw his repudiation, but not otherwise, the contract may proceed. It is not an irrevocable election not to treat the renunciation as a breach.'" *Builder's Concrete,* 58 Ill.App.3d at 105, 15 Ill.Dec. 517, 373 N.E.2d 863 (quoting *Bu–Vi–Bar Petroleum Corp. v. Krow,* 40 F.2d 488, 492 (10th Cir. 1930)).

Whether Kato intended to anticipatorily breach depends on the construction of the December 14 letter. Mr. Keeshin titled his letter "Termination of Concession Agreement." Further, in the body of the letter, he wrote that "Kato ... hereby serves notice of termination of the [CA]." The plain language of the letter supports Roboserve's claim that Kato intended to anticipatorily breach.

Whether Roboserve responded properly after the breach depends on if it brought suit promptly or changed its position detrimentally. *Wilmette Partners,* 230 Ill.App.3d at 260, 171 Ill.Dec. 657, 594 N.E.2d 1177. The record reflects that, initially, Roboserve continued to receive performance, hoping that Kato would withdraw its repudiation. When Kato refused, Roboserve contested Kato's right to terminate the agreement. Tr. at 878. Once Roboserve believed that the contest was futile, it brought suit in August. Whether it filed suit promptly after the contest appeared hopeless is a matter for the jury. Given the time it takes large corporations to run the course of one option and gear up for the next, particularly if it is litigation, we find that the jury's verdict was not against the clear weight of the evidence. Therefore, on the issue of liability, Kato is entitled to neither a judgment as a matter of law nor a new trial.

■ On the other hand, under *Wilmette Partners* and *Builder's Concrete,* if a party chooses to treat the repudiation as a wrongful termination, it cannot toll the time for beginning to collect from the breaching party beyond the date of termination. Therefore,

we grant Kato's motion for a judgment as a matter of law with regard to when the five year calendar began to run, and we determine that it began on the date of termination, March 1, 1993. Below, in the damages section, we will revisit this issue.

Therefore, on the issue of liability, we deny Kato's motion for judgment as a matter of law, but on the issue of damages, we grant its motion in part. We deny Kato's alternative motion for new trial.

### D.  *Fraud Claim*

#### 1.  *Kato's Denial of Fraud*

■ Kato denies that Hyatt perpetrated a fraud. It argues that the November 11 "one-year test" letter was not false when made because Mr. Connolly had a side agreement with ServiSystems that enabled Hyatt to nullify the contract if need be. It also argues that Hyatt did not induce Roboserve to rely on its supposedly false statement. Roboserve never asserted its rights under the CA for Kato to induce it to forego enforcing them. Moreover, if Roboserve did assert its rights, Kato would have had no reason to induce it to forego enforcing them because Kato's agreement with Roboserve was at least as profitable as Kato's agreement with ServiSystems.

Roboserve maintains that it made the necessary allegations to allege Hyatt's fraud. It alleged that Hyatt made an untrue material statement in the November 11 letter, which announced the "one-year test."[7] Hyatt knew the statement was untrue because Mr. Connolly earlier signed the "noncancellable and unconditional" agreement with ServiSystems. Pl.Ex. 45. Hyatt made the untrue statement to induce Roboserve's reliance. It wrote the letter and, subsequently, staged negotiations so Roboserve would forego enforcing its rights under the amended CA and so Hyatt could continue enjoying its allegedly more profitable agreement with ServiSystems. Roboserve reasonably relied on Hyatt's false statement because it came from Mr. Zadikoff, a vice president of Hyatt. Finally, Roboserve's reasonable reliance led to

---

7.  Roboserve also alleged that Hyatt orally promised that the winner of the test would "get the [broader] Hyatt business," meaning the business from Hyatt hotels other than the HRC.

its injury; Hyatt prevented it from getting the HRC and other Hyatt business and caused it to incur business and legal expenses.

Whether Kato's statement was false when made and whether it induced Roboserve to rely on its statement are issues of fact for the jury. Based on the above discussion, we believe that the jury did not act against the clear weight of the evidence when it found in favor of Roboserve. Therefore, on this point, Kato is entitled to neither judgment as a matter of law nor a new trial.

### 2. Kato's Denial of Vicarious Liability for Fraud

Kato argues that, if Hyatt perpetrated a fraud, Kato can be liable for it only as it relates to the HRC, not the rest of the Hyatt hotels. As a sophisticated player, Roboserve knew that all Hyatts were individually owned, that Kato owned only the HRC, and that Kato hired Hyatt to manage only the HRC. On those facts, Roboserve could not reasonably rely on a statement from Hyatt that would bind Kato beyond the HRC.

Roboserve argues that Kato cloaked Hyatt in apparent authority to bind Kato beyond its means. Actually, Roboserve's argument takes shape not as an "apparent authority to bind," but as some hybrid such as an "apparent authority to leverage." In Roboserve's own words, "Kato put Hyatt in a position where Hyatt could use promises of other Hyatt business to wrest concessions from Roboserve in [its] dealings with [the HRC]." Pl.'s Br. at 8. For support, Roboserve points to Mr. Keeshin's June 21, 1990, letter in which he discussed Roboserve's relationship with the HRC, other Hyatt hotels, and the Hyatt Corporation. Pl.Ex. 58.

■ The nature and extent of an agent's ability to bind a principal are well established.

An agent's actions might bind the principal based on express, implied, or apparent authority. The first two are species of actual authority. Implied authority is actual authority implied by facts and circumstances, and may be proved by circumstantial evidence. By contrast, apparent authority is a form of estoppel arising exclusively from the principal's words or conduct. It exists where a principal, by his own words and deeds, creates in a third party the reasonable impression that an agent has authority to perform a certain act on the principal's behalf. The elements of apparent agency are (1) the principal's consent to or knowing acquiescence in the agent's exercise of authority, (2) the third party's knowledge of facts giving rise to (3) a good faith belief that the agent possessed authority to perform the act on the principal's behalf, and (4) the third party's detrimental reliance on the agent's apparent authority.

*Wabash Publishing Co. v. Stoppa,* 1994 WL 48785, at \*4, 1994 U.S.Dist.Lexis 1522, at \*12–3 (N.D.Ill. Feb. 14, 1994) (citations omitted); *see Wabash Indep. Oil Co. v. King and Wills Ins. Agency,* 248 Ill.App.3d 719, 724, 188 Ill.Dec. 644, 618 N.E.2d 1214 (5th Dist.), .*appeal denied,* 153 Ill.2d 570, 191 Ill.Dec. 630, 624 N.E.2d 818 (1993). If an agent exceeds the scope of his authority, he incurs liability on himself, not his principal. *Degen v. Amer. Ass'n of Oral and Maxillofacial Surgeons,* 1994 WL 13754, at \*3 (N.D.Ill. Jan. 14, 1994).

■ Whether for purposes of binding or leveraging, an apparent agency relationship cannot follow from Roboserve's evidence. For example, there is nothing to suggest that Kato, "by [its] own words and deeds, creat[ed] in [Roboserve] the reasonable impression that [Hyatt] ha[d] authority to" leverage its negotiations with other Hyatt business. *Wabash Publishing,* 1994 WL 48785, at \*4, 1994 U.S.Dist.Lexis 1522, at \*13. Because Mr. Keeshin is a Hyatt employee, his June 21 letter cannot be enough; it is not "exclusively" Kato's "word[ ] or deed[ ]." *Wabash Publishing,* 1994 WL 48785, at \*4, 1994 U.S.Dist.Lexis 1522, at \*13. Moreover, given Roboserve's sophistication, it could not have had a "good faith," "reasonable impression" that Hyatt's authority from Kato extended beyond the HRC. *Wabash Publishing,* 1994 WL 48785, at \*4, 1994 U.S.Dist.Lexis 1522, at \*13. On such an important matter in an arm's length deal, Roboserve must point to more than the

agent's puffing.[8] Hyatt may have been a zealous manager for its clients, but Roboserve cannot place at Kato's feet liability for fraud that extended beyond its domain, certainly not the value of all leverageable business beyond its domain. That would be letting the tail wag the dog.

When we view all of the evidence "in its aspect most favorable to" Roboserve, the evidence still overwhelmingly favors Kato. *Hardin*, 962 F.2d at 640. Therefore, to the extent that the jury found Kato vicariously liable for Hyatt's fraud beyond the HRC, we grant Kato's motion for judgment as a matter of law. Below, in the damages section, we will revisit this issue.

### E. Punitive Damages

#### 1. Kato's Denial of Gross Fraud

Kato argues that we should reverse the punitive damages award because Hyatt committed no gross fraud. Kato contends that this was just a case of the right hand not knowing what the left hand was doing. Specifically, when Mr. Zadikoff wrote the November 11 letter, he was unaware of the contract with ServiSystems. Moreover, when he and Mr. Keeshin learned of the ServiSystems contract, they understood it to include Mr. Connolly's oral side agreement, the one that would have allowed Kato to withdraw from the contract if need be.

Roboserve maintains that the November 11 letter instigated the Kato-authorized fraud, the "gross" nature of which arose during the multi-year cover-up of the ServiSystems contract. The cover-up constituted, for example, withholding information about the contract and staging negotiations with Roboserve.

"A federal court sitting in diversity looks to the law of the state, Illinois, in determining the appropriateness of punitive damages." *Europlast, Ltd. v. Oak Switch Sys.*, 10 F.3d 1266, 1276 (7th Cir.1993). "While it is true that punitive damages are unavailable in contract cases in Illinois, ... there is an exception when the defendant is also found to have committed an independent tort, separate from the breach of contract." *Hardin*, 962 F.2d at 638.

"Illinois courts do not favor punitive damages and insist that plaintiffs must establish 'not only simple fraud but gross fraud, breach of trust, or "other extraordinary or exceptional circumstances clearly showing malice or wilfulness." '" *Europlast*, 10 F.3d at 1276 (quoting *AMPAT/Midwest v. Ill. Tool Works, Inc.*, 896 F.2d 1035, 1043 (7th Cir.1990) (quoting another source)). "In a case involving intentional fraud, 'punitive damages are properly recoverable ... "where the false representations are wantonly and designedly made." '" *West v. W. Casualty and Sur. Co.*, 846 F.2d 387, 398 (7th Cir.1988) (quoting *Home Sav. and Loan Ass'n v. Schneider*, 108 Ill.2d 277, 284, 91 Ill.Dec. 590, 483 N.E.2d 1225 (1985) (quoting another source)).[9]

The record will not likely reflect a defendant's motives outwardly or objectively. "[T]he transcript of a trial in a fraud case will seldom reveal admissions by the defendant that his conduct was not only fraudulent but intentionally, willfully, or recklessly so." *Durant v. Sur. Homes Corp.*, 582 F.2d 1081, 1088 (7th Cir.1978).

█ On the other hand, evidence of a pattern of conduct can imply a defendant's motives and support an award of punitive damages. "Punitive damages are appropriate [where] ... the course of the [defendants'] conduct ... demonstrates a continuing pattern of deceit." *Merrill Lynch Mortgage Corp. v. Narayan*, 1989 WL 4222, at *2, 1989 U.S.Dist.Lexis 423, at *4 (N.D.Ill. January 17, 1989). "The record here does not support the punitive damage award made by the trial court. Taken as a whole, the record does not establish a pattern of bad faith by

---

**8.** Roboserve could have named Haytt as a party, but it chose not to, and that choice has consequences here.

**9.** "Today, the nature of punitive damages in Illinois is clearly singular—it is punishment for the defendant. (citation omitted). That punishment is designed in turn to promote three purposes:

(1) to act as retribution against the defendant; (2) to deter the defendant from committing similar wrongs in the future; and (3) to deter others from similar conduct." *Hazelwood v. Ill. Cent. Gulf R.R.*, 114 Ill.App.3d 703, 712, 71 Ill.Dec. 320, 450 N.E.2d 1199 (1983).

[the defendant] during its dealings with [the] plaintiffs." *Kleidon v. Rizza Chevrolet, Inc.,* 173 Ill.App.3d 116, 122, 122 Ill.Dec. 876, 527 N.E.2d 374 (1st Dist.), *appeal denied,* 123 Ill.2d 559, 128 Ill.Dec. 891, 535 N.E.2d 402 (1988). "The jury was entitled to conclude that this conduct was deliberate and purposeful, orchestrated by responsible management over a significant period of time." *West,* 846 F.2d at 398.

▇▇▇ "'[W]here a plaintiff's factual allegations are sufficient to state a legally cognizable claim for punitive damages, the trial court has discretion to submit the issue to the jury.'" *AMPAT/Midwest,* 896 F.2d at 1044 (quoting *Motsch v. Pine Roofing Co.,* 178 Ill.App.3d 169, 177, 127 Ill.Dec. 383, 533 N.E.2d 1 (1st Dist.1988)).

Under cases such as *West,* Roboserve's supported allegation of a multi-year cover-up was evidence of a pattern of conduct sufficient to state a legally cognizable claim for punitive damages. *See, e.g.,* 846 F.2d at 400. Based on that evidence, we properly exercised our discretion and allowed the issue to go to the jury. Moreover, given the duration and scale of the alleged cover-up, the jury's award of punitive damages was not against the clear weight of the evidence. Therefore, on this issue, Kato is entitled to neither a judgment as a matter of law nor a new trial.

### 2. Kato's Denial of Vicarious Liability for Gross Fraud

▇▇▇ Kato argues that, if Hyatt committed gross fraud, Kato should not be held vicariously liable for it. Although "[Hyatt] was engaged to manage [the] HRC," "[t]here was no evidence that [Hyatt] was an officer or director of Kato, that any of its employees were officers or directors of Kato, or that [Hyatt] was a division of Kato." Def.Br. at 9. Instead, "[t]he agents whose conduct was sought to be imputed to Kato were in fact agents of Kato's agent, [Hyatt], acting with respect to proposed transactions unrelated to [Hyatt]'s operation of Kato's hotel." *Id.*

Roboserve maintains that Kato is vicariously liable because, in Illinois, corporate principals are liable for the gross fraud of their managerial agents. *See Mattyasovszky v. West Towns Bus Co.,* 61 Ill.2d 31, 36–7,

330 N.E.2d 509 (1975). Because Kato admits that Hyatt was its managerial agent, the damage award should stand.

Illinois follows the Restatement (Second) of Agency § 217C ("§ 217C"), which provides:

Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if: (a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting within the scope of employment, or (d) the principal or a managerial agent of the principal ratified or approved the act.

*Mattyasovszky,* 61 Ill.2d at 36–7, 330 N.E.2d 509. The issue is whether, pursuant to § 217C(c), Hyatt was an "agent ... employed in a managerial capacity."

Some Illinois appellate courts have diverged from the plain language of § 217C, confusing the definition of the term. Those courts have allowed vicarious liability only when the agents are "superior officers" such as "officers and directors." For example, in *Tolle v. Interstate Sys. Truck Lines,* the court favorably noted that "[o]ther courts have followed a complicity rule whereby the corporate master is liable for punitive damages only when the superior officers order, participate in, or ratify outrageous conduct." 42 Ill.App.3d 771, 773, 1 Ill.Dec. 437, 356 N.E.2d 625 (5th Dist.1976) (citing *Roginsky v. Richarson–Merrell, Inc.,* 378 F.2d 832, 842–3 (2nd Cir.1967)); *see Oakview New Lenox School Dist. v. Ford Motor Co.,* 61 Ill. App.3d 194, 200, 19 Ill.Dec. 43, 378 N.E.2d 544 (3rd Dist.1978) (following the language in *Tolle* ); *Pendowski v. Patent Scaffolding Co.,* 89 Ill.App.3d 484, 489, 44 Ill.Dec. 544, 411 N.E.2d 910 (1st Dist.1980) (continuing to follow the language in *Tolle* ).

Only one court, *Kemner v. Monsanto Co.,* 217 Ill.App.3d 188, 160 Ill.Dec. 192, 576 N.E.2d 1146 (5th Dist.), *appeal denied,* 142 Ill.2d 655, 164 Ill.Dec. 918, 584 N.E.2d 130 (1991), has considered the "managerial agent" and "superior officer" language and presented definitions of the two terms. *Id.* at 206–8, 160 Ill.Dec. 192, 576 N.E.2d 1146.

It defined "managerial agent" as "an employee who acts with supervisory authority, being invested with general powers to exercise discretion and judgment in dealing with corporate matters; his interests are identified with those of the corporation...." *Id.* Next, it defined "superior agent" by quoting *Tolle:*

> [U]nless, as charged [by the court], 'the officers or directors, that is, the management' of the company or the relevant division 'either authorized, participated in, consented to or, after discovery, ratified the conduct' giving rise to such damages. [Citations]. New York, in other words, adheres to the 'complicity rule,' holding the corporate master liable for punitive damages 'only when superior officers either order, participate in or ratify outrageous conduct.'

*Id.* at 206–7, 160 Ill.Dec. 192, 576 N.E.2d 1146 ((quoting *Tolle,* 42 Ill.App.3d at 773, 1 Ill.Dec. 437, 356 N.E.2d 625) (quoting *Roginsky,* 378 F.2d at 842)).

The court implicitly sided with the *Tolle* definition: "As noted in *Pendowski,*[10] this [respondeat superior] instruction, while valid under other circumstances, was ill-suited to convey the correct principles of law to the jury, since it could impute liability for *any* act done by an employee, rather than only those specifically ordered, participated in, or ratified by a superior officer." *Id.* at 208, 160 Ill.Dec. 192, 576 N.E.2d 1146 (citing *Pendowski,* 89 Ill.App.3d at 487, 44 Ill.Dec. 544, 411 N.E.2d 910).

Two significant cases reveal, however, that Illinois courts continue to follow the plain language definition of "managing agent." First, in *Deal v. Byford,* 127 Ill.2d 192, 130 Ill.Dec. 200, 537 N.E.2d 267 (1989),[11] the plaintiff apartment resident sued SRP Associates ("SRP"), a partnership that owned the plaintiff's apartment, for the actions of Mr. Byford, the apartment complex's sometime manager, sometime handyman. *Id.* at 195–6, 130 Ill.Dec. 200, 537 N.E.2d 267. The plaintiff complained that Mr. Byford used verbal and physical threats to remove her from the apartment. The record showed that Mr. Byford's implied managerial duties included signing "documents" for SRP such as five-day notices. *Id.* at 198, 130 Ill.Dec. 200, 537 N.E.2d 267. More importantly, the record showed that the defendant admitted that Mr. Byford was the apartment complex's residential manager and that, as such, he was a managing agent. *Id.* at 205–6, 130 Ill.Dec. 200, 537 N.E.2d 267. Based on that showing, the court "conclude[d] that SRP's admissions were sufficient ... to satisfy the standard expressed in *Mattyasovszky* and Restatement [217C] for the imposition of punitive damages against a principal when the agent is employed in a managerial capacity...." *Id.* at 206, 130 Ill.Dec. 200, 537 N.E.2d 267.[12]

As in *Deal,* Kato admits that Hyatt was the HRC's manager and that, as such, Hyatt was a managing agent. As in *Deal,* that should be sufficient for the imposition of punitive damages.[13]

Second, in *Abshire v. Stoller,* 235 Ill. App.3d 849, 176 Ill.Dec. 559, 601 N.E.2d 1257 (1st Dist.1992), *appeal denied,* 148 Ill.2d 639, 183 Ill.Dec. 15, 610 N.E.2d 1259 (1993), the plaintiff claimed "that he was misled by Stoller's representation that a construction loan ha[d] been obtained." *Id.* at 859, 176 Ill.Dec. 559, 601 N.E.2d 1257. Consequently, the plaintiff sued Stoller and his employer Salk, Ward & Salk, Inc. ("Salk"). The evidence

**10.** One of *Tolle*'s progeny.

**11.** This one preceded *Kemner,* but it is an Illinois Supreme Court opinion. See footnote 12.

**12.** Kato does not argue that Hyatt acted outside the scope of its employment.

**13.** The *Kemner* court distinguished *Deal* by giving it a "close reading" and finding that the defendant was a partnership, not a corporation. Presumably, this distinguishing feature precluded the defendant from having "superior officers." That, in turn precluded the court from applying the "superior officer" standard. Be-

cause the defendant was, in a sense, off the scale, the court could attach liability. The *Kemner* court believed that, because corporations are on the scale, it should not so loosely interpret the standard for vicarious liability. The *Kemner* court's attempt to distinguish *Deal* is unpersuasive. First, the *Deal* court provided no grounds for believing it placed weight on the corporate versus partnership distinction. Second, the *Deal* court did not, as it easily could have done, analogize the corporate "superior officer" to the partnership "partner status," and Mr. Byford was no partner.

showed that "Stoller's authority was limited to calling potential customers, gathering preliminary information, and completing an application form to submit to others at Salk who would then decide on the appropriateness of a particular borrower or project for further consideration." *Id.* at 857, 176 Ill. Dec. 559, 601 N.E.2d 1257. The jury found Salk vicariously liable for punitive damages, and the appellate court reversed the jury's finding.

In its *Mattyasovszky* analysis, the court considered two definitions of "manager," one from *Kemner* and the other from *Adams v. Zayre Corp.*, 148 Ill.App.3d 704, 102 Ill.Dec. 121, 499 N.E.2d 678 (2nd Dist.1986). From *Kemner*, the *Abshire* court quoted only its "managerial agent" and "managerial employee" language, fully discounting its "superior officer" language. *See Kemner*, 217 Ill. App.3d at 206–8, 160 Ill.Dec. 192, 576 N.E.2d 1146. From *Adams*, the *Abshire* court gleaned a similar definition of "managing agent," namely one who is "in a position of authority or control." In the end, the *Abshire* court wrote:

> Whether we adopt the definition of a manager discussed in *Kemner* or the manager discussed in *Adams* whose authority was limited to a specific department, we conclude that Stoller, the agent in this case, could not be considered a manager in either context where he had no authority or responsibility for any other employees or the operation of any department within the corporation.

*Id.*, 235 Ill.App.3d at 859, 176 Ill.Dec. 559, 601 N.E.2d 1257.

Although the *Abshire* court reached no conclusion on the full definition of "managing agent," the opinion remains important. It showed that the range of possible definitions need not include "superior officers." Further, it showed that, whatever the full definition of the term, the baseline includes only the concept of responsibility for other employees or the oversight of a corporate department.

As discussed in *Abshire*, Hyatt had responsibility for other employees; it managed the entire HRC. Also, Hyatt was in charge of a corporate department, or an equivalent, the HRC. As in *Abshire*, that should be sufficient for the imposition of punitive damages.

In any event, the split in the definition between "managing agent" and "superior officer" is more apparent than real. In *Kemner*, the "plaintiffs contend[ed] that the use of the term 'managerial agent' [was] consistent with *Mattyasovszky*, and that *Tolle* and *Pendowski* [wrongly] impose[ed] a stricter burden of proof on the plaintiffs through their use of the term 'superior officer.'" *Id.*, 217 Ill.App.3d at 206, 160 Ill.Dec. 192, 576 N.E.2d 1146. The court wrote: "Although plaintiffs assert that there is 'a big difference' between the terms, no case law is cited in support of this contention." *Id.* Apparently, then, the court did think it self-evident that there was "a big difference" between the terms, and the court did not go on to explain one.

As the *Kemner* court hinted, there is, in fact, no "big difference" between the terms. The *Tolle* court and its progeny took the "superior officer" language from *Roginsky*, a Second Circuit case from New York. In *Pirre v. Printing Developments, Inc.*, 468 F.Supp. 1028 (S.D.N.Y.), *aff'd without op.*, 614 F.2d 1290 (2nd Cir.1979), the New York court provided a definition of "superior officer:"

> The test of who is a 'superior officer' or a 'person of authority' to bind the corporate entity to participation or ratification cannot be rigid ...[.] The question is whether the act or ratification is done by a person of such responsibility as to arouse the 'institutional conscience' ...[.] The test is whether the continuing tortious conduct has been brought home to the consciousness of a relatively important managerial personnel with authority to make a decision for the corporation that would have prevented the damage.

*Id.* at 1039 (quoting *Doralee Estates v. City Service Oil Co.*, 569 F.2d 716, 722 (2nd Cir. 1977)).

Every Illinois court that discusses vicarious liability in some detail reproduces a quote such as the one from *Pirre*. For example, in *Kemner*, the court reproduced the following:

The complicity rule ... seems consistent with the rationale behind the concept of punitive damages. Either as a basis for punishment or for deterrence of wrong-doers, some deliberate corporate participation should be shown before this sanction is applied. [Citation]. The complicity analysis will allow punitive damages where the institutional conscience of the corporate master should be aroused while protecting the corporate master from liability for punitive damages when a properly supervised employee acts with requisite circumstances of aggravation.

217 Ill.App.3d at 204, 160 Ill.Dec. 192, 576 N.E.2d 1146 (quoting *Tolle*, 42 Ill.App.3d at 773–4, 1 Ill.Dec. 437, 356 N.E.2d 625) (added emphasis removed). The bottom line is that, like the New York courts, the Illinois courts are concerned with tortious conduct that touches the corporate conscience.

The apparent split arose from several courts taking the words "superior officer" from the New York opinions and using them as a proxy for "corporate conscience." They used the words because superior officers, or officers and directors, are generally the ones who embody the corporate conscience. In other words, the superior officers are good examples of holders of the corporate conscience, and those examples usually suffice to exclude from consideration the agent at issue.

In *Tolle*, it sufficed to exclude the truck driver from incurring liability on his principal. *See* 42 Ill.App.3d at 772, 1 Ill.Dec. 437, 356 N.E.2d 625. In *Oakview*, it sufficed to exclude the auto mechanic. *See* 61 Ill.App.3d at 196, 19 Ill.Dec. 43, 378 N.E.2d 544. In *Pendowski*, it sufficed to exclude the scaffolding worker. *See* 89 Ill.App.3d at 486, 44 Ill.Dec. 544, 411 N.E.2d 910. In *Kemner*, it sufficed to exclude the train driver. *See* 217 Ill.App.3d at 194, 160 Ill.Dec. 192, 576 N.E.2d 1146. In *Brummerstedt v. Amer. Airlines, Inc.*, 845 F.Supp. 532 (N.D.Ill.1993), it sufficed to exclude the baggage handler. *Id.* at 533. On the other hand, in *Kochan v. Owens–Corning Fiberglass Corp.*, 242 Ill.App.3d 781, 182 Ill.Dec. 814, 610 N.E.2d 683 (5th Dist.), *appeal denied*, 152 Ill.2d 561, 190 Ill. Dec. 891, 622 N.E.2d 1208 (1993), *and cert. denied*, —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994), it sufficed to include the company president. *Id.* at 796–7, 182 Ill.Dec. 814, 610 N.E.2d 683. Kato's argument simply takes advantage of the fact that the Illinois courts sometimes import by rote the words "superior officers" when they intend nothing more than to decide their cases clearly, objectively and simply.

This case is a strong example of why there is no "big difference" between the terms. Here, the usual proxies for corporate conscience are imperfect. The principal, Kato, hired another corporation, Hyatt, to manage its hotel, the HRC. Kato admits that it hired Hyatt, that Hyatt was its agent and that Hyatt managed the hotel. Despite Kato's admitting that it gave Hyatt such enormous responsibility for the operation of its property, Kato suggests that Hyatt's actions did not "arouse[ ]" its "institutional conscience." *Kemner*, 217 Ill.App.3d at 204, 160 Ill.Dec. 192, 576 N.E.2d 1146. It suggests that a corporation can extricate from its conscience actions of its managers simply by placing them behind another corporate structure. Consciences, whether corporate or individual, are not that limited. Further, we cannot fault the jury members who, following the letter and spirit of their state's law, shared the same belief.

Therefore, despite *Kemner*, the Illinois courts have not limited the scope of vicarious liability to exclude agents who satisfy the plain language of § 217C. Based on the above discussion, the courts have not gone so far from *Mattyasovszky* that a defendant can successfully argue that its admitted managerial agent is not a "managerial agent." Therefore, on this issue, Kato is entitled to neither judgment as a matter of law nor a new trial.

### F. Damages

#### 1. Standard of Review

"Because fixing a damage award is an exercise in fact-finding, only those awards that are 'monstrously excessive,' born of passion and prejudice, or not rationally connected to the evidence may be altered." *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1554, *reh'g denied*, (7th Cir.1990) (quoting *Matter*

*of Innovative Const. Sys., Inc.,* 793 F.2d 875, 887–8 (7th Cir.1986)). Below, we refer to this standard of review as "the *Pincus* standard."

### 2. The Contract Claim

Kato argues that, for two reasons, Roboserve improperly used a lost profits theory of recovery. One, it was improper because Roboserve could not determine its loss with a reasonable degree of certainty. Kato had an obligation to use reasonable endeavors, but it could not know beforehand which guests would make minibar purchases. Because there was no way to know, Roboserve was left trying to distinguish between the profits it lost due to Kato's failure to perform and those it lost due to the luck of the draw. Kato argues that Roboserve had no principled way to distinguish the instances. Two, it was improper because it produced an award that was not within Kato's reasonable contemplation. Because Roboserve did not have an exclusive contract with Kato, it could not lay claim to all of the minibar profits from the HRC. Yet because Roboserve nonetheless used ServiSystems' profits to calculate its loss, it calculated an overcompensatory amount.

With a three-part argument, Roboserve maintains that it properly used the lost profits theory. One, Kato could have known with some degree of certainty who the "correct" people were because it conducted a study of its Gold Passport rooms and found that the people who stayed in them made minibar purchases with a much higher frequency than average. Two, based on that study, the CA obligated Kato to fill the Gold Passport rooms with RoboBars.[14] Three, the supply of RoboBars at the HRC exceeded the demand each night for minibars of either brand. Therefore, Kato could have put the "correct" people in the "correct" rooms, and, if it had done so, Roboserve's supply would have met the demand. Because of this reasonable endeavors/excess supply situation, the CA became analogous to an exclusive contract, making Roboserve's use of the

"competitor's profits" theory a proper choice.[15]

■ The proper amount of damages for a breach of contract claim is that amount which makes the non-breaching party whole, meaning that amount which puts the non-breaching party in the position he would have occupied had the parties fulfilled their obligations.

"There are three [requirements] to apply in determining whether lost profits will be allowed as compensation in [a] contract case[ ]":

> 'Lost profits will be allowed if (1) their loss is proved with a reasonable degree of certainty [citations omitted]; (2) the court is satisfied that the wrongful act of the defendant caused the loss of profits [citation omitted]; and (3) the profits were reasonably within the contemplation of the defaulting party at the time the contract was entered into [citation omitted].'

*Vranas & Assocs., Inc. v. Family Pride Finer Foods, Inc.,* 147 Ill.App.3d 995, 1007, 101 Ill.Dec. 151, 498 N.E.2d 333 (2nd Dist.1986), *appeal denied,* 113 Ill.2d 586, 106 Ill.Dec. 57, 505 N.E.2d 363 (1987) (quoting *Rivenbark v. Earnest, Inc.,* 37 Ill.App.3d 536, 538–9, 346 N.E.2d 494 (5th Dist.1976)).

"Under Illinois law, it is not necessary to prove lost profits with 'absolute certainty.'" *Havoco of Amer., Ltd. v. Sumitomo Corp. of Amer.,* 971 F.2d 1332, 1345, *reh'g denied,* (7th Cir. Sept. 9, 1992) (quoting *Midland Hotel Corp. v. Donnelley Corp.,* 118 Ill.2d 306, 315, 113 Ill.Dec. 252, 515 N.E.2d 61 (1987)). Although "an award for lost profits 'cannot be based upon conjecture or sheer speculation,' mathematical precision is not possible or required." *Id.* (quoting *Midland Hotel,* 118 Ill.2d at 315–6, 113 Ill.Dec. 252, 515 N.E.2d 61); *see Independence Tube Corp. v. Copperweld Corp.,* 691 F.2d 310, 328 (7th Cir.1982), *rev'd on other grounds,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). "Rather, 'a recovery may be had for prospective profits when there are any crite-

---

**14.** Instead, Kato filled the Gold Passport rooms with Servibars.

**15.** At trial, Roboserve proved what those profits were and how much of them Roboserve would have made given that its and ServiSystems' contracts were different. Tr. at 707 *et seq.*

ria by which the probable profits can be estimated with reasonable certainty.'" *Id.* (citation omitted). Moreover, "a defendant whose actions contribute to the difficulties of accurate measurement is in a poor position to demand precision." *Independence Tube,* 691 F.2d at 329.

In *Vranas,* the court reaffirmed the standard for determining whether profits are reasonably within the contemplation of the defaulting party. 147 Ill.App.3d at 1007, 101 Ill.Dec. 151, 498 N.E.2d 333.

'As a general rule ... the damages to which one party to a contract is entitled because of a breach thereof by the other are such as arise naturally from the breach itself, or such as may reasonably be supposed to have been within the contemplation of the parties at the time of making the contract as a probable result of a breach thereof. ...

'In the application of the rule it is held that the parties will be presumed to have contemplated that the party injured by the breach of the contract would sustain such damages as would fairly and substantially, in the usual course of things, result from such breach, in light of all the facts known or which should have been known to them. ...

'... It is not required that the parties shall have considered the consequences at the time of making the contract, but the consequences must be such as the parties may fairly be supposed to have considered, or at least would have considered as flowing from a breach of the contract if they had then been informed of all of the facts.'

*Id.* at 1007–8, 101 Ill.Dec. 151, 498 N.E.2d 333 (quoting *Sitnick v. Glazer,* 11 Ill.App.2d 462, 467–8, 138 N.E.2d 84 (1st Dist.1956)).

Plaintiffs generally follow either of two methods when figuring their amount of lost profits. If they follow the methods properly, they should satisfy the reasonable certainty and reasonable expectation requirements. In the first method, which is the preferred one, plaintiffs figure the amount of lost profits with reference to their own previous profits, extrapolating them over the years of the breach. For example, in *Bergner & Co. v. Lloyds Jewelers, Inc.,* 130 Ill.App.3d 987, 86

Ill.Dec. 59, 474 N.E.2d 1256 (3rd Dist.1984), *rev'd on other grounds,* 112 Ill.2d 196, 97 Ill.Dec. 415, 492 N.E.2d 1288 (1986), the court wrote: "projection of future profits by Lloyds' expert witness was based on Lloyds' performance in prior years. This is the generally accepted method of calculating lost profits." *Id.* at 993, 86 Ill.Dec. 59, 474 N.E.2d 1256. Similarly, in *Klucznik v. Nikitopoulos,* 152 Ill.App.3d 323, 105 Ill.Dec. 141, 503 N.E.2d 1147 (2nd Dist.1987), the court stated that "[we] have frequently recognized that lost profits may appropriately be calculated by using profits realized in prior years." *Id.* at 329, 105 Ill.Dec. 141, 503 N.E.2d 1147.

In the second method, plaintiffs figure the amount with reference to their competitor's profits. Plaintiffs typically use this method when there is a breach of an exclusive sales contract. For example, in *Oakleaf v. Oakleaf & Assoc., Inc.,* 173 Ill.App.3d 637, 123 Ill.Dec. 288, 527 N.E.2d 926 (1st Dist.), *appeal dismissed without op.,* 123 Ill.2d 560, 128 Ill. Dec. 892, 535 N.E.2d 403 (1988), the court held that "[v]iolations of exclusive sales contracts can be recompensed by a damage award based on the amount of sales made by a competitor in the identified territories." *Id.* at 648, 123 Ill.Dec. 288, 527 N.E.2d 926 (citing *Transcon, Inc. v. Motion Inc.,* 14 Ill.App.3d 61, 302 N.E.2d 135 (1st Dist.1973)).

The "lost profits" problem this case presents is not one of first impression. In *Superbird Farms, Inc. v. Perdue Farms, Inc.,* 970 F.2d 238 (7th Cir.1992), the defendant argued that "the record lack[ed] sufficient evidence to support the jury's damage award as remitted by the district judge because the evidence presented by.[the plaintiff] through its damage expert, Dr. Rhan, was speculative and went beyond any credible theory of recovery." *Id.* at 248. The court noted that, "[a]t trial, [the defendant] did not respond to Dr. Rahn's testimony with its own damage expert, choosing instead to contest the case on liability grounds." *Id.* The court then detailed the defendant's various objections to Dr. Rahn's theory for calculating the plaintiff's lost profits. After detailing them, it concluded:

It is readily apparent that [the defendant's] challenges to the lost profits calculations have some plausibility. The jury certainly could have taken these criticisms into account and reduced the damage award. Indeed, the jury had that opportunity because [the defendant] raised almost all of these issues in its cross-examination of Dr. Rahn, and in its closing argument. The jury chose to believe Dr. Rahn, who was qualified to render an opinion on these issues. [Citation omitted].

*Id.* at 248–9.

■ As in *Superbird,* Kato did not present its own expert witness on damages or provide its own theory of damages. Rather, it satisfied itself by raising plausible objections to Roboserve's qualified expert during cross examination and closing argument. Also as in *Superbird,* the jury had an opportunity to hear the objections, and it chose to believe Roboserve's expert. The jury exercised its prerogative as a fact-finder, and it produced a measured result. Showing that it gave Kato's objections some weight, the jury awarded only $2,100,000 of the $2,300,000 that Roboserve sought.

Also, in *Medcom Holding Co. v. Baxter Travenol Lab., Inc.,* 1990 WL 104039, 1990 U.S.Dist.Lexis 8062 (N.D.Ill. June 29, 1990), we faced a problem similar to the one in this case and, to analyze it, we imported a test from the First Circuit. *Id.* at *12. The test:

look[s] at three factors in determining whether a lost profits award [is] rationally based on the evidence: (i) whether the plaintiff explained the assumptions on which the profit projections were based; (ii) whether the defendant had an opportunity to expose inconsistencies, inadequacies or inaccuracies in the plaintiff's testimony either by cross-examination or summation; and (iii) whether the defendant could have presented evidence of its own to indicate what the outer limits of the plaintiff's damages might have been.

*Id.* (citing *Wallace Motor Sales v. Amer. Motors Corp.,* 780 F.2d 1049, 1062 (1st Cir. 1985)).

As the court discussed in *Medcom,* Roboserve explained the assumptions on which its based its profit projections. Tr. at 707 *et seq.* Further, Kato had opportunities to expose inconsistencies, inadequacies or inaccuracies. Tr. at 730 *et seq.* and 1059 *et seq.* Further still, Kato could have presented evidence of its own about what the outer limits of Roboserve's damages might have been, but it chose not to, aside from its comments during cross examination and summation.

Therefore, the jury's award satisfies the *Pincus* standard, and we deny Kato's alternative motion.

### 3. The Fraud Claim

■ First, Kato contests the compensatory award, mainly based on its belief that the jury awarded Roboserve "benefit of the bargain" damages, the amount that it claimed because of its inability "to get the [broader] Hyatt business."

Roboserve sought the compensatory damages because Kato's fraud prevented it from getting the remaining HRC business, which amounted to an additional 870 units, or from getting "the [broader] Hyatt business." At trial, Roboserve's expert testified that the value of that lost business was $8,009,254. Further, Roboserve sought compensatory damages for the attorneys fees it incurred, which amounted to $12,800.

As discussed above, we agree with Kato that the jury should not have awarded damages for the lost "benefit" beyond the confines of the HRC. We believe, however, that the jury also agreed with Kato and discounted the award by an appropriate amount, making a remittitur unnecessary. Roboserve requested over $8,000,000, and the jury awarded it only $1,000,000. Given the number of units involved, the average lost profit per year, and the length of the fraud, we believe that the compensatory award satisfies the *Pincus* standard. Tr. at 707 *et seq.*

Second, Kato contests the punitive award, arguing that it is excessive.

"Illinois courts look to three factors in analyzing [the excessiveness of a punitive damage award]: (1) the nature and enormity of the wrong, (2) the financial status of the defendant, and (3) the potential liability of the defendant resulting from multiple

claims."[16] *Hardin*, 962 F.2d at 640. "The defendant bears the burden of proving damages are excessive." *Id.*

■ The "enormity of the wrong" factor may depend on subjective considerations such as the duration of the wrongful activity. "With respect to the first factor, ... the jury was entitled to conclude that [the defendant's] conduct was not merely a single incident. Rather [the defendant's] deceitful conduct took place over nearly a two-year period, and its actions were deliberate and purposeful." *West*, 846 F.2d at 400. In this case, the deceit lasted even longer than it did in *West*. Therefore, Kato does not carry its burden of proving that the damages are excessive.

■ The "enormity of the wrong" factor may also depend on objective, mathematical considerations. "The amount of compensatory damages is also an appropriate consideration in evaluating the excessiveness of a punitive damage award." *Medcom*, 1990 WL 104039, at *15, 1990 U.S.Dist.Lexis 8062, at *42. Where a defendant argues excessiveness and "the award [is] less than three times the amount of compensatory damages, the argument is "unpromising," particularly given "the jury's discretion in picking a suitable figure." *Midland Management Corp. v. Computer Consoles Inc.*, 1993 WL 69624, at *1, 1993 U.S.Dist.Lexis 3436, at *4 (March 10), *recons. denied*, 1993 WL 316725, 1993 U.S.Dist.Lexis 11450 (N.D.Ill. Aug. 16, 1993). Generally, a ratio of punitive to compensatory awards of 2.7 "does not by itself suggest an unreasonable" amount. *DeRance, Inc. v. PaineWebber Inc.*, 872 F.2d 1312, *reh'g denied*, (7th Cir. June 19, 1989). In this case, the ratio of punitive to compensatory awards falls safely within the proscribed range. Therefore, again, Kato does not carry its burden of proving that the damages are excessive.

■ Like the first factor, the "financial status of the defendant" factor may depend on objective, mathematical considerations. "Our research reveals that a typical ratio for a punitive damages award to a defendant's net worth may be around 1%." *Cash v. Beltmann N. Amer. Co., Inc.*, 900 F.2d 109, 111, n. 3 (7th Cir.1990) (providing an extensive list of citations). In this case, the punitive damages award of $6,000,000 and the defendant's net worth of $980,000,000 yield a ratio that is clearly under 1%.

Therefore, the jury award satisfies the *Pincus* standard, and we deny Kato's alternative motion as to the fraud claim.

### 4. The Wrongful Termination Claim

Kato argues that the award is excessive and that, in any event, the jury calculated the award based on an incorrect starting date.

■ We disagree that the award is excessive. Again, given the number of units involved, the average lost profit per year, and the length of the contract term, we believe that, except as adjusted below, the compensatory award satisfies the *Pincus* standard. See Tr. at 707 *et seq.* In fact, Roboserve's expert on damages recommended $1,160,302, and the jury discounted it to $850,000.

As we discussed above, however, we agree that the jury calculated the award based on an incorrect starting date. The jury received a special interrogatory which asked, "If you find that the Concession Agreement was amended, has the sixty calendar month period begun to run?" The jury answered that the calendar period had not begun to run, leading the jurors to award damages for a five year period beginning on January 1, 1994. Yet we granted Kato's motion for judgment as a matter of law about when the calendar period began to run, and we determined that it began on March 1, 1993.

Because there is a three-quarters of a year difference between the starting dates, we remit the amount the jury would have awarded for three-quarters of a year of profits. If the jury awarded $850,000 for five years, it likely awarded $170,000 per year, and $42,500 per quarter. Therefore, we subtract $42,500 × 3, or $127,500, from $850,000, leaving a compensatory award of $722,500.

Therefore, because we remit $127,500 of the total damage award, we enter a judgment

---

**16.** The issue of multiple claims is inapplicable in this case.

for the remaining amount, which is $9,822,-500.

### III. Conclusion

For the reasons discussed above, we grant in part Kato's alternative motions for judgment as a matter of law and remittitur, and we deny its motion for new trial.